THE STATE EX REL. ATTORNEY GENERAL VS. CUNNINGHAM, Secretary of State.

*February 10 — March 22, 1892.*

SUPREME COURT: ORIGINAL JURISDICTION.   (*1, 2*) *Matters* publici juris: *Who may bring suit?*   (*3, 4*) *Injunction against secretary of state: Ministerial duties : Notices of election under invalid act.*
CONSTITUTIONAL LAW : APPORTIONMENT.   (*5–7*) *Validity of apportionment act: Jurisdiction : Legislative or political power? Constitution mandatory.*   (*8, 9*) *Judicial notice.*   (*10*) *Ordinance of 1787: Organic act of territory.*   (*11–17*) *Constitutional requirements: Senate and assembly districts: County lines not to be broken: Precincts: Equality of representation: Apportionment act an entirety.*   (*18*) *Numbering senate districts.*   (*19*) *Acts of legislature* de facto.   (*20*) *When apportionment must be made.*

1. In matters strictly *publici juris*, in which no one citizen has any right or interest other than that which is common to citizens in general, a petition by a private person for leave to commence an action in

The State ex rel. Attorney General vs. Cunningham.

this court in the name of the state cannot properly be considered until the attorney general has been requested to move in the matter and has refused or unreasonably delayed to do so.

2. In a matter *publici juris*, an action by the attorney general in the name of the state may be maintained to enforce the public or common right, without the intervention of a private relator. And if there be a private relator, his want of any special interest in the subject matter or in the relief sought is no objection to the action.

3. The original prerogative jurisdiction of this court extends to an action brought by the attorney general in the name of the state to enjoin the secretary of state from issuing or publishing notices of an election of members of the legislature under an apportionment act alleged to be invalid. Such an action involves matters *publici juris*,— the preservation of a constitutional legislature and of the political rights and the liberties of the people.

4. The official acts of the secretary of state in issuing and publishing such notices of election are purely ministerial, and hence may be controlled either by *mandamus* or injunction as the exigencies of the case may require.

5. Since it cannot be determined whether the injunction should be refused or granted without first determining whether the apportionment act in question is or is not a valid law, the court has jurisdiction to determine the question of the constitutionality of the act.

6. The power to "apportion and district anew the members of the senate and assembly," vested in the legislature by sec. 3, art. IV, Const., is strictly a legislative power; and an apportionment act which violates the constitutional requirements may be declared void by the courts.

7. The restrictions upon the power of the legislature to make an apportionment, found in secs. 3–5, art. IV, Const., are mandatory, and not merely directory.

8. In determining the validity of an act of the legislature the courts can consider only matters of which they may take judicial notice.

9. Courts will take judicial notice of a census, whether taken under the authority of the state or of the United States. They will also take judicial notice of the location, general boundaries, and juxtaposition of counties, towns, and wards.

10. The Ordinance of 1787, and the organic act of the territory of Wisconsin, became obsolete upon the admission of the state into the Union; but they may be regarded as *in pari materia,* and helpful and of historical value, in construing the sections of the constitution which took the place of any of their provisions.

11. Under sec. 4; art. IV, Const., requiring assembly districts to be "bounded by county, precinct, town, or ward lines," the county is

The State ex rel. Attorney General vs. Cunningham.

the primary territorial unit of representation in the assembly, and the integrity of county lines must be preserved; so that no assembly district can be made to consist of one, or more than one, county and a fraction of another county, or to include fractions of two or more counties.

12. We have now no civil subdivisions, other than towns and wards, which are the equivalent of the precinct mentioned in sec. 4, art. IV, Const.

13. Under sec. 3, art. IV, Const., providing that the legislature shall "apportion and district anew the members of the senate and assembly, *according to the number of inhabitants*," there must be no unnecessary inequality in the proportionate representation in the assembly of counties and of districts containing two or more counties, on the basis of population. Each county and each such district, having a population equal to the numerical unit of representation in the assembly, is entitled absolutely to one member of assembly, unless it is found necessary to attach to such county another county having less than the numerical unit of representation. For each multiple of said numerical unit reached by the population of any county, such county is also absolutely entitled to an additional member of assembly. The remainder of the 100 members of assembly, not thus absolutely apportioned, should be apportioned, by some uniform equitable rule, to an equal number of the several counties — probably to the counties having the largest fractions of population in excess of said numerical unit or multiple thereof.

14. The several provisions of an apportionment act are so largely dependent upon each other that if the constitutional requirements are violated in the formation of some of the assembly districts the whole act must be held void.

15. In the formation of assembly districts in a county entitled to more than one member, the integrity of towns and wards must be preserved, and the districts must each consist of contiguous territory, and must be as compact and as nearly equal in population as practicable.

16. Under sec. 5, art. IV, Const., senate districts must each consist of entire assembly districts and be formed of convenient contiguous territory; and under sec. 3 they must be as nearly equal in population as other constitutional requirements will permit.

17. Under the census of 1890, the numerical unit of representation in the senate is 51,117 and in the assembly 16,868, as near as may be. The apportionment act of 1891 (ch. 482) created senate districts varying in population from 38,690 to 68,601, and assembly districts varying in population from 6,823 to 38,801. *Held*, that this disparity

The State ex rel. Attorney General vs. Cunningham.

in population of the districts is a violation of the mandate of the constitution that the apportionment shall be "according to the number of inhabitants." The differences are greater than can be justified by the exercise of any judgment or discretion.

18. The constitution contains no limitation upon the power of the legislature to number the senate districts as it sees fit.

19. The acts of a legislature elected under a void apportionment act are not invalid merely for that reason.

20. Under sec. 3, art. IV, Const., requiring the legislature to make a new apportionment at their first session after each enumeration of the inhabitants of the state, such duty of the legislature is a continuing one until performed. And if the apportionment act passed at the first session after an enumeration is held invalid, the legislature may at a special session pass a valid apportionment act.

ACTION commenced in the supreme court to restrain the secretary of state from publishing certain notices of election. The preliminary proceedings are stated in the following opinion, which was filed February 2, 1892:

LYON, C. J. At the last sitting of this court (January 15, 1892) Solon W. Pierce, Esq., district attorney of Adams county, purporting to act under the direction of the board of supervisors of that county, petitioned for leave to commence an action in this court in the name of the state, on the relation either of the attorney general, of Adams county, or of himself, against the secretary of state, to perpetually enjoin him and his successors in office from giving or publishing notices for the election of senators and members of assembly in districts constituted, or attempted to be constituted, by ch. 482, Laws of 1891, entitled "An act to apportion the state into senate and assembly districts," approved April 25, 1891, the object of the proposed action being to obtain an adjudication of the question whether said ch. 482 is or is not a valid enactment. On the same day a similar petition was presented by Leonard Lottridge, Esq., a citizen of the state, residing in La Crosse county. A proposed relation or complaint accompanied each petition.

When these petitions were presented it was suggested to the attorney for the petitioners that under the law and the practice in this court in such cases the petitions could not properly be considered until the attorney general should be requested to move in the matter and should refuse or unreasonably delay to do so. Thereupon such request was made on behalf of Adams county, and the attorney general promptly asked leave to bring an action in this court, as requested, for the purpose aforesaid.

The question involved is one of grave public concern, and if this court has jurisdiction to determine it the proposed action seems to be a proper one in which to exercise the original jurisdiction of this court under the constitution. It is ordered, therefore, that leave be granted the attorney general to bring such action. Questions of jurisdiction are reserved until the relation or complaint is filed.

The commencement of such action will necessarily supersede the petitions of Messrs. Pierce and Lottridge, who are at liberty, if so advised, to withdraw their respective petitions and the papers accompanying the same.

The following statement of the subsequent proceedings and of the pleadings was prepared by Mr. Chief Justice LYON:

On February 2, 1891, leave was granted the attorney general to bring an action in this court in behalf of the state against *Thomas J. Cunningham*, secretary of state, to perpetually enjoin and restrain him and his successors in office from giving or publishing notices of the election of senators and members of assembly in districts constituted, or attempted to be constituted, by ch. 482, Laws of 1891, entitled " An act to apportion the state into senate and assembly districts," approved April 25, 1891. When such leave was granted a statement of the previous proceedings in the matter was filed. Reference thereto is sufficient without repeating the statement here.

On the same day the attorney general filed an information or complaint in this court on behalf of the state, pursuant to the leave so granted. The information is founded upon sec. 3 and amended secs. 4 and 5 of art. IV of the constitution. These sections are as follows:

" Section 3. The legislature shall provide by law for an enumeration of the inhabitants of the state in the year one thousand eight hundred and fifty-five, and at the end of every ten years thereafter; and at their first session after such enumeration, and also after each enumeration made by the authority of the United States, the legislature shall apportion and district anew the members of the senate and assembly, according to the number of inhabitants, excluding Indians not taxed, and soldiers and officers of the United States army and navy.

" Section 4. The members of the assembly shall be chosen biennially, by single districts, on the Tuesday succeeding the first Monday of November, after the adoption of this amendment, by the qualified electors of the several districts. Such districts to be bounded by county, precinct, town, or ward lines, to consist of contiguous territory, and be in as compact form as practicable.

" Section 5. The senators shall be elected by single districts of convenient contiguous territory, at the same time and in the same manner as members of the assembly are required to be chosen; and no assembly district shall be divided in the formation of a senate district. The senate districts shall be numbered in the regular series, and the senators shall be chosen alternately from the odd and even numbered districts. The senators elected or holding over at the time of the adoption of this amendment shall continue in office till their successors are duly elected and qualified; and after the adoption of this amendment all senators shall be chosen for the term of four years."

The information charges that ch. 482, Laws of 1891, vio-

The State ex rel. Attorney General vs. Cunningham.

lates the foregoing provisions of the constitution in that (1) It does not "apportion and district anew the members of the senate and assembly according to the number of inhabitants, excluding Indians not taxed, and soldiers and officers of the United States army and navy,"as required by sec. 3 of art. IV; (2) Many of the assembly districts which the act attempts to form are not "bounded by county, precinct, town, or ward lines," within the meaning of that requirement in amended sec. 4; (3) Many of such districts are not "in as compact form as practicable," as required by the same section; (4) Some senate districts do not consist "of convenient contiguous territory," as required by amended sec. 5 of art. IV; (5) The senate districts are so numbered that the electors in certain counties and parts of counties representing 231,218 inhabitants, who were last allowed by law to vote for senators at the general election in 1888, will not be permitted to do so again until such election in 1894, if ch. 482 be held a valid law, while electors representing 168,809 inhabitants, who were permitted to vote for senators at the general election in 1890, will, if such act be upheld, be allowed to vote again for senators at such election in 1892.    And further that the present senators in the odd-numbered districts, under ch. 482, will represent for the next two years (or until January, 1894, when their terms will expire) 387,122 inhabitants who had no voice in their election, and 530,289 inhabitants who were permitted to participate in their election.

The information sets out the number of inhabitants in each senate and assembly district in the state as formed by ch. 482, and specifies many instances in which it is claimed such apportionment violates each and all the constitutional provisions and restrictions above mentioned.    It alleges the population of the state to be 1,686,880, according to the enumeration made by authority of the United States in 1890, and hence, that each assembly district should have

The State ex rel. Attorney General vs. Cunningham.

been formed to contain about 16,868 inhabitants, and each senate district about 51,117 inhabitants, whereas the population of the senate districts attempted to be formed by ch. 482 varies from 38,690 in the twenty-second district to 68,601 in the twenty-seventh district, and the population of the assembly districts varies from 6,823 in the district consisting of the third ward of Milwaukee, to 38,801 in the district consisting of the county of La Crosse. It should be stated, however, that the population in a large number of the legislative districts approximates quite closely the numerical unit of representation.

It is believed that the foregoing statement of the contents of the information will sufficiently explain the grounds upon which the validity of ch. 482 is attacked, and it is not necessary to go more into detail.

Immediately upon the filing of the information, and on the day the same was filed, the secretary of state admitted due service of the summons herein, and by his attorney, E. S. Bragg, Esq., entered his appearance to the action, and interposed a motion to dismiss the information, for the following reasons stated in the motion:

"1. The plaint states no facts showing the relator to have any interest in the subject matter thereof which entitles him to a standing in court to petition for relief from grievances real or supposed.

"2. It appears upon the face of the plaint that this court has no jurisdiction of the subject matter thereof; and that its recital and averments state no wrongs, real or supposed, cognizable in a court of law or equity.

"3. That the plaint of the relator fails to show any violation of the constitution of Wisconsin, either in letter or spirit, in the bill or act apportioning the members of the legislature for the state of Wisconsin upon the federal enumeration of population of 1890."

*Edward S. Bragg*, of counsel, for the defendant:

I. The right to challenge a law on the ground of its violation of the constitution, and call in the aid of the judicial power, by any party, is confined to such person only whose complaint discloses an injury to him, his property, or his rights. Cooley, Const. Lim. (3d ed.), 163; *Wellington, Petitioner*, 16 Pick. 96; *Hingham & Quincy B. & T. Corp. v. Norfolk*, 6 Allen, 357. To understand just what is intended by the phrase "injury to him, his property, or his rights," in the authorities cited, a recurrence to the "declaration of rights" in the constitution of Wisconsin will be useful. Art. I, sec. 1. And the method of enforcement of a citizen's rights which come within the constitution is found in the same article. Sec. 9. An able lawyer and learned man says, in order to give jurisdiction to a court "counsel must show a controversy with a party, not a controversy with the law; they must show an individual right, not a general public right. This court does not sit as conservators over public rights. . . . If there was no other objection to the case, this would be sufficient. No controversy has ever arisen under the law with any party, citizen of a state, public officer, or anybody else." Henry Stanbery, Attorney General, in *Georgia v. Stanton*, 6 Wall. 60. And his views were not dissented from, nor controverted in any manner, by such great lawyers as Chas. O'Conor, R. J. Walker, Justice Sharkey, and Jeremiah Black, who were counsel in the opposition. See, also, *Hill v. Higdon*, 5 Ohio St. 245; *Maloy v. Marietta*, 11 id. 638. The rights claimed to be trenched upon must be more than an "undefined right." *People v. Gallagher*, 4 Mich. 252. It is not enough to put in motion the original jurisdiction of this court that the question is *publici juris*. It should be one that pertains to the sovereignty of the state, its franchises or prerogatives, or the liberties of the people. *Att'y Gen. v. Eau Claire*, 37 Wis. 443, citing *Att'y Gen. v. Railroad*

*Cos.* 35 id. 425. The courts are not the guardians of the rights of the people, except as those rights are secured by some constitutional provision that comes within the judicial cognizance. Cooley, Const. Lim. 168. The constitution guarantees to no man or set of men the right to vote for any person, *except as provided for by law*, nor for any particular office, *except as fixed by law*, and no oftener than the law provides for elections in the district where he or they reside. Nor does it declare for equality of representation to all voters alike. Nor does it guarantee such political subdivisions that will give the same force and effect and share in making laws to the minority as to the majority vote, or even proportional force and effect.

II. "The legislative power is supreme and absolute on all political questions; and upon all questions within its discretion it is entirely independent of the judiciary." The very novelty of the claim for relief made in this matter stamps it as quack medicine. "The fact that no such application was ever made before indicates the general judgment of the profession that *no such application should be entertained.*" CHASE, C. J., in *Mississippi v. Johnson*, 4 Wall. 500. And, in this connection, *the futility* of any judgment, by reason of lack of all power in the judiciary to execute, and the direful consequences attendant upon an attempt to coerce the legislature and the executive of the state, show the wisdom of the chief justice when he says: "The impropriety of such interference will be clearly seen upon consideration of its possible consequences." The judgment would be a mere abstract declaration, reflecting on the conduct of the legislature.

It will be conceded that in general terms the constitution is *a limitation of power* upon the legislative department, while it is a *grant of power* to the judicial department. This distinction should always be kept in view. The political power of the state is not lodged in the judicial branch,

but in the executive and legislative branches. Nor can there be found in express words or by implication in the constitution any conferred power of appeal from the political to the judicial branch of the government. Where the power to do an act is exclusively in the legislature, accompanied with a discretion how it shall be done, it would seem to be a very grave assumption of power for the judiciary to array its reason against the reason of men selected and acting as the legally constituted delegates of the supreme power (the people) to pass upon the *reasonableness or un-reasonableness*, as well as the necessity, of all laws. See Smith's Comm. ch. 7. All powers in government must be vested ultimately somewhere, and where no appeal is provided in the written law, and no final arbiter fixed in the organic law, that ultimate lodgment must be in the representatives of the people, subject only to their verdict of approval or disapproval declared through the ballot-box. *Opinions of the Judges*, 10 Gray, 616–625. This lack of power in the courts to assume appellate or revisory jurisdiction over legislative action resting in judgment as to the doing or manner of doing an act, has been declared in this court. *Phelps v. Rooney*, 9 Wis. 91 (top); *Harriman v. Queen Ins. Co.* 49 id. 85; *State ex rel. Moreland v. Whitford*, 54 id. 150; *Land, L. & L. Co. v. Brown*, 73 id. 304. And see *State ex rel. Garnes v. McCann*, 21 Ohio St. 198.

See, especially, *Georgia v. Stanton*, 6 Wall. 50 *et seq.;* and also *Comm. v. McCloskey*, 2 Rawle, 374; *Madison & Ind. R. Co. v. Whiteneck*, 8 Ind. 222; *Bull v. Read*, 13 Gratt. 98; *Goddin v. Crump*, 8 Leigh, 154; *State v. Jarrett*, 17 Md. 327. In Virginia it is held that the power in the legislators to make an apportionment is a political power, and its exercise is not subject to review by the judiciary. *Wise v. Bigger*, 79 Va. 269.

III. The apportionment of 1891 is strictly within the letter and spirit of the constitution. Sec. 3 of art. IV is a

mere direction to act, and gives the basis for action, *i. e.*, the population of the state as ascertained at the last preceding enumeration. No legal sanction being provided by which a compliance can be enforced, this provision is plainly directory. Sedgwick; Stat. & Const. Law, 317, note. If the legislature should fail to make an enumeration, or, having made an enumeration, should fail to apportion, would any one contend that the courts could cause an enumeration and apportionment to be made? And if they may not cause it to be made, nor make it, can they nullify it when made? Courts cannot nullify an act of the legislature on the vague ground that they think it opposed to a general latent spirit supposed to pervade or underlie the constitution. *Walker v. Cincinnati*, 21 Ohio St. 41. The people have reserved to themselves, and to no other tribunal, the right of judgment over the action of their representatives. Failure in duty may be punished by " nonreturn," by " acts of popular disapproval," and the like; but the punishment, whatever it may be, is administered in the great court of public opinion.

The provision of sec. 4, art. IV, Const., that assembly districts shall· " be bounded by county, precinct, town, or ward lines, *and be in as compact form as practicable*," is the one whereon an attempt is made to base a constitutional objection to the law. As to the compactness of the districts the framers of the constitution saw the total impracticability if not impossibility of the application of ironclad rules to this work, and hence made the clause advisory, leaving the legislature to judge what they deemed practicable; but no where is indicated a contemplated reference to a court as arbiter. If the word "practicable " is an issuable word, if it be a matter of fact in dispute (and it cannot be a matter of law), there can be no review of the conclusion of the legislature on that question of fact. *Ramsay v. People*, 19 N. Y. 48. It is significant that the words

" compact in form " are wanting in the section relating to senate districts. The directing clause in reference to them is that they shall be " of convenient contiguous territory." It is hardly to be believed that the convention intended to create two rules, differing in construction and effect, each designed to secure the same result to the electors, *i. e.*, approximate equality of representation, upon the ratio of population. In such cases the doctrine that statutes *in pari materia* shall be construed together obtains, and that construction which shall best harmonize all the provisions shall prevail. Such construction will discard the words on which the petitioner builds, and substitute the word " convenient ; " and contemporaneous construction (in the apportionment made a part of the original constitution) shows that this was the true meaning and intent of the convention. A comparison with the section giving the legislature power to alter the limits or increase the number of judicial circuits, " making them as *compact* and convenient as practicable," shows that the use of the word " compact " was in view of the wide range of its meaning, and not in a single narrow sense.

The rule is settled that questions of policy, of justice or injustice, fairness or unfairness, form no weight in the scale in determining questions arising upon legislative acts touching property rights between persons, corporations, and municipalities ; and that even in such case the question of constitutionality or otherwise is a delicate one, and the law will always be upheld in a doubtful case. See *Fletcher v. Peck*, 6 Cranch, 128 ; *Palms v. Shawano Co.* 61 Wis. 218, 219.

*Charles E. Estabrook*, of counsel, for the plaintiff :

The relator is seeking in this proceeding to invoke the original jurisdiction of this court to restrain the secretary of state from performing a ministerial duty, upon the ground that the law under which he proposes to act is un-

constitutional. The original jurisdiction vested in this court by sec. 3, art. VII, Const., has been exercised in *quo warranto* cases in *Att'y Gen. v. Blossom*, 1 Wis. 317, and *Att'y Gen. ex rel. Bashford v. Barstow*, 4 id. 567. See, also, cases collected in 1 Simmons' New Wis. Dig. p. 716. In the exercise of its original jurisdiction this court has also issued the writ of *certiorari* to review the proceedings of state officers clothed with power under the statutes to perform certain administrative duties. See *State ex rel. Moreland v. Whitford*, 54 Wis. 150; 6 Political Science Quarterly, 493; *State ex rel. Sch. Dist. v. Thayer*, 74 Wis. 48. And the original jurisdiction to control the ministerial action of state officers by means of the writ of *mandamus* has often been asserted. See *State ex rel. Drake v. Doyle*, 40 Wis. 175; *State ex rel. Continental Ins. Co. v. Doyle*, id. 220, 236; *State ex rel. Sloan v. Warner*, 55 id. 271; *State ex rel. McDill v. Board*, 36 id. 498; *State ex rel. Anderson v. Timme*, 60 id. 344; *S. C.* 70 id. 627; *State ex rel. Burnett Co. v. Harshaw*, 73 id. 211; *State ex rel. Bell v. Harshaw*, 76 id. 230. The above cases establish the doctrine that when a state officer is charged with the performance of any official duty, and is not clothed with discretion, the court will review his action and compel him to perform that duty according to law; and that in all such cases the court will interpret the law and the constitution and compel action in accordance with them as interpreted. It was settled in *Att'y Gen. v. Railroad Cos.* 35 Wis. 425, followed in *Att'y Gen. v. Eau Claire*, 37 id. 400, that this court "has original jurisdiction of any information on behalf of the state in the nature of an injunction bill in chancery," in all matters *publici juris* which "affect the sovereignty of the state, its franchises or prerogative, or the liberties of the people." The phrase "liberties of the people," in a judicial sense, means the aggregate political rights and franchises of the people of the state at large. *In re Pierce*, 44 Wis. 441.

The foregoing cases settle the question of the original jurisdiction of this court to control the action of the secretary of state in the discharge of the ministerial duties of his office. That his duties in giving notices of election are purely ministerial, involving no element of discretion, seems too clear for argument. For cases involving the question of discretionary powers and ministerial duties, see *State ex rel. Martin v. Doyle*, 38 Wis. 92, and cases cited; *State ex rel. Comstock v. Joint Sch. Dist.* 65 Wis. 631, and cases cited on p. 638.

Cases from the supreme court of the United States illustrate and enforce the doctrine contended for. *Osborn v. Bank of U. S.* 9 Wheat. 738; *Davis v. Gray*, 16 Wall. 203; *Board of Liquidation v. McComb*, 92 U. S. 531; *Pennoyer v. McConnaughy*, 140 id. 1. And see Mechem, Pub. Off. § 997.

The power of courts to adjudge statutes unconstitutional is one of the distinctive features of our American jurisprudence and political system. The Federalist, No. 78; 3 Webster's Works, 20; 5 Political Science Quarterly, 224; 1 Bryce, Am. Comm. ch. 23; 14 Am. Law Rev. 175. For cases in which the supreme court of the United States has exercised this power, see 131 U. S., Appendix. In many cases this court has held statutes unconstitutional, and as illustrating the jealousy with which the rights and political privileges of the citizen are guarded by this court, see *Dells v. Kennedy*, 49 Wis. 555; *State ex rel. Weiss v. Dist. Board*, 76 id. 177.

[*Mr. Estabrook* then proceeded to state the history of secs. 3–5, art. IV, Const., and to point out instances in which he claimed ch. 482, Laws of 1891, violated the constitutional requirements. Upon the question whether or not the senatorial districts are composed of " convenient contiguous territory," he referred to maps or diagrams said to represent the ninth and twenty-eighth districts as consti-

The State ex rel. Attorney General vs. Cunningham.

tuted by the act of 1891, which are printed herewith. He stated that the ninth district contains a population of 6,844 in excess of the unit of representation; that, excluding the two towns taken from Winnebago county and the four towns taken from Monroe county, the district as con-

DIAGRAM SHOWING THE TWENTY-EIGHTH SENATORIAL DISTRICT.

District indicated by shaded lines.

stituted would still have a population of 1,563 in excess of the unit of representation; that each of the senatorial districts from which such towns are taken has, and with such towns included would still have, a population less than the unit of representation; and that the district extends from a point near Oshkosh (less than nine miles from it) to within

The State ex rel. Attorney General vs. Cunningham.

six miles of La Crosse county, exactly 103 miles long " as the crow flies," and more than 175 miles by any known thoroughfare or railway.]

If town and ward lines only are to govern in the formation of assembly districts, and county lines be disregarded, the word " county " in the connection in which it appears is mere surplusage. But " effect is to be given if possible to the whole instrument and every section and clause, and in favor of a construction which will render every word operative." Cooley, Const. Lim. (5th ed.), 70, 71. The county " is the distinguishing feature of the Anglo-American state. To it, more than to the township or any other single factor, must be ascribed the success which has attended the extension of representative government to the vast western empire of the United States." Howard's Local Const. Hist. of U. S. 304.

The legislature is but a co-ordinate branch of our state government, bound to observe the rules of the constitution as much as the humblest official. *Att'y Gen. ex rel. Bashford v. Barstow,* 4 Wis. 567. The provisions of the constitution limiting its power are not merely directory, but are inhibitory and imperative. *State ex rel. Brayton v. Merriman,* 6 Wis. 14; *Varney v. Justice,* 86 Ky. 596. The rules applicable to the construction of statutes are to be applied in construing the constitution. See cases collected in 1 S. & B. Ann. Stats. p. 35. The legislature cannot suspend rights guaranteed by the constitution. *Coffman v. Bank of Ky.* 90 Am. Dec. 311. The question whether a law is a violation of the constitution is purely a judicial question. *In re Ruan Street,* 132 Pa. St. 257; Cooley, Const. Lim. (5th ed.), 55. As to how the courts should construe the constitution, see *Lake Co. v. Rollins,* 130 U. S. 670; *State ex rel. Weiss v. Dist. Board,* 76 Wis. 209; *Wis. Cent. R. Co. v. Taylor Co.* 52 id. 37, 63, 64; Cooley, Const. Lim. 81; *Bay City v. State Treasurer,* 23 Mich. 506; *People v. Harding,* 53 id. 485.

The constitution having prescribed the manner of making the apportionment, that is in effect a prohibition against a different manner of doing it. *State ex rel. Murphy v. Barnes*, 24 Fla. 29. An inhibition arising by necessary implication is as effective as one which is expressed. *People ex rel. Bolton v. Albertson*, 55 N. Y. 50; *Page v. Allen*, 58 Pa. St. 338, 98 Am. Dec. 272.

*Geo. W. Bird*, of counsel for relators:

I. The question involved is one of public right, in which all the citizens of the state are concerned, and the relator need not have any individual or private interest. *People ex rel. Case v. Collins*, 19 Wend. 56; *People ex rel. Blacksmith v. Tracy*, 1 How. Pr. 189; *People ex rel. Fuller v. Board of Supervisors*, 18 id. 461; *People ex rel. Stephens v. Halsey*, 37 N. Y. 344; *Hamilton v. State ex rel. Bates*, 3 Ind. 452; *State ex rel. Rice v. County Judge*, 7 Iowa, 186; *State ex rel. Byers v. Bailey*, id. 390; *County of Pike v. State ex rel. Metz*, 11 Ill. 202; *State ex rel. Drake v. Doyle*, 40 Wis. 175.

II. The supreme court has jurisdiction of the subject matter of this action, and ample authority to hear and determine all the questions involved.

1. It is settled that this court, in the exercise of the original jurisdiction conferred upon it by the third clause of sec. 3, art. VII, Const., has rightful authority to control action by injunction as well as by *mandamus* in proper cases. *Att'y Gen. v. Railroad Cos.* 35 Wis. 425; *Att'y Gen. v. Eau Claire*, 37 id. 400. In the former case injunction was given to prevent the violation of a valid statute, and in the latter to prevent compliance with a void statute.

2. In several cases the court has exercised its original jurisdiction by *mandamus* to compel state officers, including the secretary of state, to discharge official duties under valid statutes. *State ex rel. Drake v. Doyle*, 40 Wis. 175;

*State ex rel. Continental Ins. Co. v. Doyle,* id. 220; *State ex rel. Sloan v. Warner,* 55 id. 271; *State ex rel. Burnett Co. v. Harshaw,* 73 id. 211; *State ex rel. Bell v. Harshaw,* 76 id. 230.

3. This established jurisdiction to restrain by injunction the violation of valid statutes or compliance with void statutes, extends to determining the question whether the legislature, in the exercise of the apportioning power in a given case, has kept within the limitations imposed by the constitution. (*a*) The power of the legislature to apportion and redistrict the members thereof is not an absolute, arbitrary, and unconditional power, but is subject to certain well defined express limitations.  Secs. 3-5, art. IV, Const. (*b*) The purpose of these limitations was to secure a fair and equitable apportionment of the members of the legislature among the people of the state, by grouping them into districts composed of convenient and contiguous territory, having equal population and a community of local interests.  *Kinney v. Syracuse,* 30 Barb. 349, 361.  (*c*) The only reason assigned why this court cannot determine the constitutionality of this law is that the question involved in such determination is a legislative or political question and not a judicial one.  Mere statement of the question shows it to be purely judicial.  If the constitution entrusted to the legislature the general, unrestricted power to apportion, it might, perhaps, be contended that the power was a purely political one, confided exclusively to the discretion of the legislature.  But when the constitution restricts the power it is not a matter of discretion with the legislature whether it will act within the restrictions or not.  So long as it does act within them it may be exercising a purely political and discretionary power, and the courts may not control its action within those limits.  But, once it oversteps those bounds, it has not only no discretion to exercise but no power to act at all.  And the courts, in avoiding its act, do not interfere with its right to exercise its discretion or po-

litical power where it has the right to exercise either or both, but determine only that it had passed the limits where it was entitled to exercise either. Such determination involves only a question of law and the exercise of a strictly judicial power. Cooley, Const. Lim. 106; *Ayar's Appeal*, 2 L. R. A. 577. (*d*) While courts cannot exercise legislative or political power, nor be empowered by the legislature to do so, yet they may determine whether the legislature, in the exercise of such power in a given case, has kept within the limits prescribed by the constitution. There is a broad distinction between the exercise of legislative power and the determination of the question whether that power has been exercised within constitutional restraints. For various illustrations of this principle and distinction, see *Galesburgh v. Hawkinson*, 75 Ill. 152; *Watertown v. Cady*, 20 Wis. 501; *Bushnell v. Beloit*, 10 id. 195; *Whittaker v. Janesville*, 33 id. 76; *Post v. Supervisors*, 105 U. S. 667; *Ramsay Co. v. Heenan*, 2 Minn. 330; *Jensen v. Polk Co.* 47 Wis. 298; *Kimball v. Rosendale*, 42 id. 407; *Warner v. Knox*, 50 id. 429; *Nevil v. Clifford*, 63 id. 435; *Ayar's Appeal*, 2 L. R. A. 577; *State ex rel. Pell v. Newark*, 40 N. J. Law, 71; *People v. Allen*, 1 Lans. 548; *State ex rel. Peck v. Riordan*, 24 Wis. 484; *State ex rel. Keenan v. Milwaukee Co.* 25 id. 339; *State ex rel. Walsh v. Dousman*, 28 id. 541; *Rooney v. Milwaukee Co.* 40 id. 23; *McRae v. Hogan*, 39 id. 529; *State ex rel. La Valle v. Sauk Co.* 62 id. 376; *Knowlton v. Rock Co.* 9 id. 410; *Janesville v. Markoe*, 18 id. 350; *Slauson v. Racine*, 13 id. 398; *Kneeland v. Milwaukee*, 15 id. 454; *In re Ruan Street*, 132 Pa. St. 257. (*e*) The courts have already taken jurisdiction to enforce at least one of the constitutional limitations upon the apportioning power,— that as to the time of its exercise. They are all imposed by the same article of the constitution, are all equally important, equally clearly and definitely expressed, and equally capable of certain enforcement. If the courts may take jurisdiction to enforce one, they may to enforce all. *Opinions of the*

The State ex rel. Attorney General vs. Cunningham.

*Judges,* 6 Cush. 575, 578; *Warren v. Charlestown,* 2 Gray, 84; *Kinney v. Syracuse,* 30 Barb. 349; *People ex rel. Att'y Gen. v. Holihan,* 29 Mich. 116; *People ex rel. Att'y Gen. v. Bradley,* 36 id. 447; *Slauson v. Racine,* 13 Wis. 398. (*f*) Courts have also taken jurisdiction to determine whether apportionment acts exceed constitutional limitations otherwise than as to time of passage. *State ex rel. Gardner v. Newark,* 40 N. J. Law, 297; *State ex rel. v. Campbell,* 48 Ohio St. 435. The *Opinions of the Justices,* 10 Gray, 613, and 142 Mass. 601, and the case of *Wise v. Bigger,* 79 Va. 269, so far as they carry with them any authority at all, are not to be followed here. The opinions of the justices were delivered in response to questions asked by the legislature, without argument and, so far as they show, without examination or consideration of authorities; and the questions asked did not reach the proposition here involved. In the Virginia case the question here involved was passed almost *sub silentio.* In opposition to the views expressed in those cases see *De Chastellux v. Fairchild,* 15 Pa. St. 18; Cooley, Const. Lim. 43–45, 94, 157.

4. This is a proper case for injunction. The statute challenged is a general statute, affecting the whole state and every subdivision thereof. If the secretary of state be permitted to act under it, the mischief will have been fully done and the people be remediless. Injunction is the only appropriate and complete remedy. *State ex rel. v. Campbell,* 48 Ohio St. 435. The act sought to be restrained is purely ministerial and therefore in its nature properly subject to control by injunction. *Mississippi v. Johnson,* 4 Wall. 475; *Board of Liquidation v. McComb,* 92 U. S. 531; *Osborn v. Bank of U. S.* 9 Wheat. 738; *Davis v. Gray,* 16 Wall. 203.

[*Mr. Bird* also pointed out instances in which ch. 482, Laws of 1881, violated the requirements of secs. 3–5, art. IV, Const.]

*John C. Spooner*, of counsel for the relator:

I. That under the constitution this court is "a court of first resort on all judicial questions affecting the sovereignty of the state, its franchises or prerogatives, or the liberties of its people;" that it has original jurisdiction to send forth the writ of injunction, as a *quasi* prerogative writ; and that it will do so in matters *publici juris,*—is settled. *Att'y Gen. v. Blossom,* 1 Wis. 317; *Att'y Gen. v. Railroad Cos.* 35 id. 512; *Att'y Gen. v. Eau Claire,* 37 id. 400.

II. That the question presented by the relation, to wit, the constitutionality of ch. 482, Laws of 1891, is one of general concern, affecting great public interests, is quite apparent. The court seems to have settled that by the brief opinion already filed. If there were doubt about it, however, it would be removed by reference to the long line of decisions of this court as to what constitutes, in its view, a matter *publici juris,* warranting the exercise of its original jurisdiction in *mandamus, quo warranto,* injunction, *habeas corpus,* and the like, collated in the brief of Judge Dixon in *Att'y Gen. v. Eau Claire,* 37 Wis. 407–408.

III. The objection that the cause must fail for want of sufficient interest in the county of Adams or its district attorney, *S. W. Pierce,* to entitle it to proceed, is clearly untenable. The matter complained of being of general public interest, the relator need not have any private interest in the thing asked for. *State ex rel. Drake v. Doyle,* 40 Wis. 176, 185–6; *People ex rel. Stephens v. Halsey,* 37 N. Y. 348; *Hamilton v. State ex rel. Bates,* 3 Ind. 452; *State ex rel. Rice v. County Judge,* 7 Iowa, 186; *State ex rel. Byers v. Bailey,* id. 390; *Pike Co. v. State,* 11 Ill. 202; *People ex rel. Case v. Collins,* 19 Wend. 56; *People ex rel. Kelly v. Common Council,* 77 N. Y. 511; *People ex rel. Waller v. Sullivan Co.* 56 id. 249; *Union Pacific R. Co. v. Hall,* 91 U. S. 355; *Pumphrey v. Mayor,* 47 Md. 145; *Att'y Gen. v. Boston,* 123 Mass.

479; *State ex rel. Currie v. Weld*, 39 Minn. 426; High,
Extr. Rem. sec. 431; *Hyatt v. Allen*, 54 Cal. 353; *State ex
rel. Flowers v. Board of Education*, 35 Ohio St. 368; *State
v. Saline Co. Court*, 51 Mo. 350, 366; *State ex rel. Singleton
v. Van Duyn*, 24 Neb. 586; *Wise v. Bigger*, 79 Va. 269.
But the action, as it now stands, is one brought by leave of
this court, in the name of the people, on the relation of
their attorney general, in a matter of great public conse-
quence. That there are added, as nominal relators, the
county of *Adams* and the district attorney, *S. W. Pierce*,
is a matter of no consequence to the defendant, not at all
affecting the right to maintain the cause. As said in *Peo-
ple v. Collins*, 19 Wend. 67, "It is not for the defendants to
object that several responsible relators appear in the mat-
ter."

IV. The relief sought is entirely appropriate and within
the competency of the court. There is nothing in the
character of the office held by the defendant, or the duties
the performance of which the court is asked to enjoin,
which puts him beyond the reach of injunction. The giv-
ing of the notices referred to in the relation is a purely
ministerial function. *State ex rel. Drake v. Doyle*, 40 Wis.
176, 186; *Flournoy v. Jeffersonville*, 17 Ind. 169; *Mississippi
v. Johnson*, 4 Wall. 498; *Gaines v. Thompson*, 7 id. 353; 2
High, Injunctions, secs. 1310, 1326; *Marbury v. Madison*,
1 Cranch, 137. It will not be doubted that if the secretary
of state gave out and threatened that he would not issue
these notices of election because of his opinion that ch.
482, Laws of 1891, is unconstitutional, and the attorney
general applied for an alternative writ of *mandamus* to
compel him to give the notices, if the court came to the
conclusion that the act is constitutional the peremptory
writ would go. This could not be so, of course, if the du-
ties were other than ministerial duties; and if a ministerial
duty, the performance of which would be compelled by

*mandamus* if it ought to be performed, it is a ministerial duty the performance of which will be prevented by injunction if it ought not to be performed. The writs of *mandamus* and injunction are correlative in their scope and purpose. *Att'y Gen. v. Railroad Cos.* 35 Wis. 520; *Mississippi v. Johnson,* 4 Wall. 498. The fact that the act sought to be restrained is commanded by *an act in the form of law,* does not make against the jurisdiction of the court to grant the writ or the propriety of so doing. *Mandamus* has often been issued by this court to compel public officers to perform duties imposed by an act, in order that thereby the constitutionality of the act may be, in the proceeding, determined; and in such cases it has been held void. *State ex rel. Peck v. Riordan,* 24 Wis. 484; *State ex rel. Keenan v. Milwaukee Co.* 25 id. 339; *State ex rel. Walsh v. Dousman,* 28 id. 541; *Rooney v. Milwaukee Co.* 40 id. 23; *State ex rel. La Valle v. Sauk Co.* 62 id. 376. And the books are full of cases where officers of the state have been restrained by the state and federal courts from invading private rights by an unconstitutional statute. *Osborn v. Bank of U. S.* 9 Wheat. 798; *Davis v. Gray,* 16 Wall. 203; *Board of Liquidation v. McComb,* 92 U. S. 541; *Cunningham v. M. & B. R. Co.* 109 U. S. 452, 453; *Antoni v. Greenhow,* 107 id. 809; *Hagood v. Southern,* 117 id. 69; *Chicago & N. W. R. Co. v. Dey,* 35 Fed. Rep. 871; *Piek v. C. & N. W. R. Co.* 6 Biss. 177; *Parsons v. Marye,* 23 Fed. Rep. 118; *In re Ayers,* 123 U. S. 506; *Claybrook v. Owensboro,* 16 Fed. Rep. 304; *Pennoyer v. McCannoughy,* 140 U. S. 1. If the writ will issue in such cases to protect *private right,* it is difficult to conceive of any reason why the discharge of a ministerial function imposed upon a ministerial officer by an unconstitutional law, the performance of which will lead to the outrage of rights guaranteed by the constitution, and affecting all the people of the state, will not be equally prevented by the writ. See, also, *Martin v. Ingham,* 38

Kan. 641; *McKinney v. Bradford Co.* 26 Fla. 267; *Poyer v. Des Plaines*, 123 Ill. 111; *Wise v. Bigger*, 79 Va. 269; *Page v. Allen*, 58 Pa. St. 358; *State ex rel. Hughlett Co. Att'y v. Hughes*, 16 S. W. Rep. (Mo.), 487; Mechem, Pub. Off. sec. 990, p. 669; *Chicago & N. W. R. Co. v. Dey*, 35 Fed. Rep. 866; *Chicago, St. P., M. & O. R. Co. v. Becker*, id. 883. The injunction, if granted, will not restrain an election, nor will it restrain the giving of notices of election of members of the senate and assembly. It will only restrain the giving of notices describing the districts attempted to be created by ch. 482. If granted, the notices could be given under valid unrepealed laws, or under a new law should one be enacted. If the preventive remedy asked for is not afforded there is no remedy, and, notwithstanding timely appeal to this court, a crime against representative government will be consummated. 2 High, Injunctions, sec. 1319; *Bradley v. Commissioners*, 2 Humph. 428.

V. The court has jurisdiction of the subject matter, that is, to hear and determine as to the constitutionality of ch. 482. "The question as to the constitutionality of a law is purely judicial and cannot be left to the legislature." *In re Ruan Street*, 132 Pa. St. 257; Brown, Jurisdiction, § 15, pp. 41, 42. The provisions of the constitution relating to apportionment are mandatory. This court has well defined the law as to directory statutes in *State ex rel. Cothren v. Lean*, 9 Wis. 279, and has well drawn the distinction between mandatory and directory statutes in *Wendel v. Durbin*, 26 id. 390. Under the rules there stated no court would declare the provisions in question, if incorporated in a statute instead of embodied in the organic law, to be directory. But the constitution is not subject to the same rule of construction in this respect as a statute; and its provisions cannot be regarded as directory. Cooley, Const. Lim. 93; *Varney v. Justice*, 86 Ky. 596; *Hunt v. State*, 22 Tex. App. 396; *French v. Edwards*, 13 Wall. 511. And see *Slauson v. Ra-*

*cine*, 13 Wis. 398. There is, it must be admitted, an authority which supports the contention that this matter of making an apportionment is political and committed to the absolute and entire control of the legislature. *Wise v. Bigger*, 79 Va. 269. But upon what principle is the power to make an apportionment a *political* power in contradistinction from a *legislative* power? Any power given by the constitution to the *legislature to enact a law* is a legislative power, and a legislative power is absolute only where the constitution leaves it without restriction. Cooley, Const. Lim. 108; *Newland v. Marsh*, 19 Ill. 383. The fact that the rights which we ask the court to protect are in their nature political rights does not make the power of apportionment a political power or the action of this court thereon an usurpation of political power. It is one of the functions of the court to protect against unconstitutional legislative invasion the political rights of the people. The court has set aside registry laws as interfering with the right to vote, and has in many cases protected that right. I traverse and repudiate the doctrine contended for on the other side, that the legislature can be under our system of government the sole arbiter of the question whether in the passage of an act it has or has not transcended its constitutional powers. *Rison v. Farr*, 87 Am. Dec. 55; *Vanhorne's Lessee v. Dorrance*, 2 Dall. 308; *Houston v. Moore*, 5 Wheat. 1. By the Ordinance of 1787 it is provided (in art. 2): " The inhabitants of said territory shall *always* be entitled to the benefits . . *of a proportionate representation of the people in the legislature.*" So that when the framers of the constitution drafted the provisions relating to apportionment and representation they *obeyed the obligation of a solemn compact.* That this court in the exercise of its original jurisdiction will use the prerogative writ of injunction to protect the sovereignty of the state to enable it to keep its compact to maintain free the navigation by logs of a rocky and rushing

river (*Att'y Gen. v. Eau Claire*, 37 Wis. 400), but has no jurisdiction to protect the sovereignty of the state in the great trust which is born of the same Ordinance, guarded with industry and intelligence in the same constitution,— the right of proportionate representation of the people in the legislature,—is the height of absurdity. The courts of the country have not regarded apportionment acts as exceptions to the rule that legislatures are bound by constitutional limitations in the enactment of laws, and that if they disregard them it is the function of the court to so declare. *Prouty v. Stover*, 11 Kan. 235; *State ex rel. Att'y Gen. v. Francis*, 26 id. 724; *State ex rel. Singleton v Van Duyn*, 24 Neb. 586; *State ex rel. Evans v. Dudley*, 1 Ohio St. 437; *State ex rel. v. Campbell*, 48 Ohio St. 435; *People ex rel. Van Bokkelen v. Canaday*, 73 N. C. 198. And see *Opinions of Justices*, 3 Me. 477; 18 id. 458; 33 id. 587; 7 Mass. 523; 15 id. 537; 3 Pick. 517; *Henshaw v. Foster*, 9 Pick. 312; *Capen v. Foster*, 12 id. 485; *Opinions of Justices*, 23 id. 547; 6 Cush. 575; *Warren v. Charlestown*, 2 Gray, 84; *Opinion of Justices*, 10 id. 613; *Stone v. Charlestown*, 114 Mass. 214.

VI. Ch. 482, Laws of 1891, is unconstitutional because it violates sec. 3, art IV, Const., which requires the legislature to "apportion and district anew the members of the senate and assembly *according to the number of inhabitants*," etc. The purpose of this provision is manifest, and the absence of discretionary language in it is conspicuous. This provision, which is common to nearly all the state constitutions, is taken from the constitution of the United States: "Representatives and direct taxes shall be apportioned among the several states according to their respective numbers," etc. Art. I, sec. 2. This language has always been treated by Congress as imposing a *specific duty*, susceptible of almost *exact performance*. It is admitted that it is not practicable to apportion the state so as to make the districts *absolutely equal* and at the same time to observe the other

limitations. And therefore there is involved, even as to the matter of inhabitants, the exercise of judgment or discretion upon the part of the legislature. But this discretion, if it may be so called, certainly arises, so far as it exists, out of the necessities of the situation, rather than out of language granting discretionary power, and is not to be considered without limit or beyond the reach of judicial review. See *Opinion of* SHEPLEY, J., 18 Me. 472-3. In this act the inequality between districts is so marked and palpable as to constitute, as to such districts, an absolute abandonment of the constitutional rule itself.

. VII. The act is unconstitutional and, as a whole, null and void for the reason that in at least twenty-five instances it violates that portion of sec. 4, art. IV, Const., which requires "such districts to be bounded by county, precinct, town, or ward lines, to consist of contiguous territory, and be in as compact form as practicable." It is *absolutely impossible* for the court to give any meaning or effect to the word "county" where it occurs in said section, unless it is construed to mean that wherever the town, ward, or precinct line, or all of them, forming the boundary of an assembly district fall upon or become coincident with a county line, the latter shall be a boundary which cannot be broken or transcended. This construction is in entire harmony with the views of the framers of the constitution, so far as those views are discoverable from the scant report of the debates. But they afforded the strongest proof of what they *meant* by what they *did*. They made the first apportionment themselves, and in it there is *no dismemberment of counties, no breaking of county lines;* nor was there in the apportionment contained in the rejected constitution. Great weight is to be given to the practical and contemporaneous construction of the constitution. *Cohens v. Virginia,* 6 Wheat. 264; *Bank of U. S. v. Halstead,* 10 id. 51-63; Cooley, Const. Lim. 82, 83.

VIII. The act is unconstitutional because it violates that portion of sec. 4, art. IV, Const., which requires districts to be "in as compact form as practicable." This language, while it is the language of discretion, is also the language of limitation; and it cannot be asserted that it leaves it in the power of the legislature to absolutely disregard the matter of compactness.

IX. The act is unconstitutional in that its re-arrangement of senate districts operates to disfranchise, as to the election of senators, a large number of the electors of the state, and to leave a great number of the inhabitants of the state represented by men in whose selection they had no voice. We are not able to point to any express prohibition of the constitution which this new formation of senate districts violates, but we assert that it violates a restriction which the constitution clearly implies and which its framers must have intended should be observed. Many times the courts have held acts of the legislature void, creating counties and towns and changing electors from one county or town or election district to another, because some omission precluded the public from voting for representatives. See *Leach v. People ex rel. Patterson*, 122 Ill. 420; *Stemper v. Higgins*, 38 Minn. 222; *Evansville v. State ex rel. Blend*, 118 Ind. 426; *State ex rel. Oyler v. Harlan Co.* 25 Neb. 33; *Duncan v. Shenk*, 109 Ind. 26; *Williams v. Potter*, 114 Ill. 628; *Opinions of the Justices*, 142 Mass. 601; *Lanning v. Carpenter*, 20 N. Y. 447; McCrary, Elections, 10; *People v. Maynard*, 15 Mich. 463–471; Cooley, Const. Lim. 616; *State v. Fitzgerald*, 37 Minn. 26; *Maynard v. Board of Canvassers*, 84 Mich. 228; *Bean v. Barton County Court*, 33 Mo. App. 635.

Orton, J. This case comes into this court, within its original jurisdiction, by bill in chancery on the relation of the attorney general on behalf of the state, praying for an

injunction against *Thomas J. Cunningham*, secretary of state, to restrain him as such officer from carrying into execution ch. 482, Laws of 1891, commonly called the "Apportionment Act," on the ground of its unconstitutionality; and more particularly that he refrain from giving the notices of the election of members of the senate and assembly as apportioned and districted by said act.

The complaint informs the court, in substance, that the legislature of 1891, in attempting by said act to apportion and district anew the members of the senate and assembly, according to the enumeration of the population of the state by the United States census of 1890, did so in violation of the restrictions contained in secs. 3–5, art. IV, of the constitution of this state, in the following particulars, viz.: *First*, the senate and assembly districts were not made "according to the number of inhabitants, excluding Indians not taxed, and soldiers and officers of the United States army and navy;" *second*, the assembly districts were not "bounded by county lines;" *third*, they were not made "to consist of contiguous territory;" *fourth*, they were not made "in as compact form as practicable;" *fifth*, the senate districts were not made "of convenient and contiguous territory."

The complaint more particularly shows that by the last census the state contained a population of 1,686,880, and by an equal apportionment of the inhabitants each senate district should have contained 51,117, and each assembly district 16,868, inhabitants, as near as may be. By said apportionment many senate districts contain the number of inhabitants, omitting fractions of a thousand, as follows: Second district, 38,000; fifth district, 68,000; seventh district, 65,000; eighth district, 43,000; eleventh district, 42,000; fourteenth district, 45,000; sixteenth district, 57,000; seventeenth district, 61,000; eighteenth district, 44,000; twentieth district, 42,000; twenty-second district,

37,000; twenty-fourth district, 58,000; twenty-seventh district, 68,000; thirty-second district, 38,000; thirty-third district, 63,000.   Many assembly districts contain the number of inhabitants as follows: 38,000, 6,000, 25,000, 7,000, 24,000, 11,000, 22,000, 11,000, 23,000, 10,000, 22,000, 11,000, 21,000, 10,000, 20,000, 11,000, 20,000, 11,000.   The highest difference between both the senate and assembly districts is over 30,000.

The case was heard on demurrer to the complaint (admitting the facts), based on the grounds·to the effect — *first,* that the court has no jurisdiction of the subject matter; and, *second,* that the complaint fails to show any violation of the constitution.   These two general questions, as well as others subordinate thereto, were very ably argued by eminent counsel on both sides; and their arguments and the authorities cited by them have rendered the court very great aid in the elucidation and decision of the case.

As a preliminary question, it has already been decided that this case could not be brought by a private relator, because no one has any private interest in the subject matter. The matters being exclusively *publici juris,* the case must be brought by the attorney general on his own relation, representing the whole state and the people thereof.  This is the form and title in which the case now stands in this court and in which it must be sustained, if at all.   That being the most difficult and important question, we shall enter at once upon the consideration of the original jurisdiction of this court to issue the injunction to restrain the secretary of state from executing the said act, which is the first ground of the demurrer.

In almost every case which has been brought in this court, within its original jurisdiction, on the relation of the attorney general in the name of the state, the jurisdiction of this court has been challenged and discussed by able counsel, and sustained by the court in many learned and elaborate

opinions. The subject matter of these cases was claimed and held to be *publici juris*, and involved the original jurisdiction of the court to issue the various writs of *habeas corpus, mandamus*, injunction, *quo warranto* and *certiorari*. It would seem, therefore, that the jurisdiction of the court and its limitations in nearly all matters of great public interest and concern had been already judicially determined. The highest authorities that can be consulted on the question of the court's jurisdiction in this case are these various decisions of the court. The precise subject matter of this case was not in any of these cases, but the analogies are sufficiently close to make them of the highest authority in this case, and some of them are clearly in point. We start upon this discussion with the benefit of these decisions, which renders the question far less difficult.

One of the first cases of this kind brought in this court was *Attorney General v. Blossom*, in *quo warranto*, 1 Wis. 317, in which the court said: "Contingencies might arise wherein the prerogatives and franchises of the state in its sovereign character might require the interposition of the highest judicial tribunal to preserve them. Other departments might need its intervention. Indeed, various emergencies may have been conceived in which this branch of the government, and this arm of the judiciary alone, might be adequate to preserve the balance of powers, to arrest usurped powers, franchises, and prerogatives, to quell resistance to constitutional authority, to preserve the liberty of the individual citizen, and shield the sovereignty of the state itself from violation." These broad grounds of the court's original jurisdiction in matters *publici juris* would seem to embrace every possible matter of great public interest. We shall hereafter inquire whether the subject matter of this case comes within these terms of the court's jurisdiction. We shall finally hold that this court has jurisdiction in this case, and we propose to remove all possible

doubt on the subject, even at the expense of being some-
what tedious. In the above case it is held also that this
court has original jurisdiction in all of the above writs, in-
cluding injunction.

In *Attorney General v. Railroad Cos.* 35 Wis. 512, the
writ of injunction was ordered to issue as a prerogative
writ, as in a case *publici juris*, to restrain the railroad com-
panies from exacting tolls for the carriage of passengers or
freight in excess of the legal rates. The jurisdiction of the
court was sustained by an opinion of the learned and em-
inent Chief Justice RYAN, the ablest, most elaborate and
clearest to be found in the Reports. This case was fol-
lowed by *Attorney General v. Eau Claire*, 37 Wis. 400, for
an injunction against the common council and city clerk,
restraining them from executing an unconstitutional law
for the obstruction of a navigable river. The whole subject
of the original jurisdiction of this court was again most
fully considered by the court in an opinion by the same
learned chief justice. The following extract from that
opinion clearly expresses the jurisdiction of the court and
its limitations in all cases where the subject matter is *pub-
lici juris:* "To warrant the assertion of original jurisdiction
here, the interest of the state should be primary and proxi-
mate, not indirect or remote; peculiar, perhaps, to some
subdivisions of the state, but affecting the state at large in
some of its prerogatives; raising a contingency requiring
the interposition of this court to preserve the prerogatives
and franchises of the state in its sovereign character, this
court judging of the contingency in each case for itself."

The earliest case involving matters *publici juris*, brought
in this court on the relation alone of the attorney general,
is *State ex rel. Att'y Gen. v. Merrill*, 2 Pin. 279, to compel
the respondent by *mandamus*, as the receiver of the canal
land office under the territory, to deliver the books and
papers and pay the money in his hands as such receiver to

the new state as the successor of the territory. In this case the original jurisdiction of the court was questioned, and sought to be sustained by an act of the legislature. But Chief Justice WHITON said in his opinion: " We are satisfied that without the act this court has jurisdiction of the case." In *State ex rel. Att'y Gen. v. Messmore*, in *quo warranto*, 14 Wis. 115, this court held jurisdiction of the case on the following grounds stated by the late and able Chief Justice DIXON: "It is instituted and conducted by the attorney general under his official oath and responsibility. This case involves the functions of a high judicial office, and the due administration of justice in a large section of the state."

In *State ex rel. Att'y Gen. v. M., L. S. & W. R. Co.*, in *quo warranto*, 45 Wis. 579, to compel said company to keep its offices, books, papers, and records within this state, the jurisdiction of the court was again questioned. It is said in the opinion: " Questions of very great public interest, involving the sovereignty and jurisdiction of the state over the corporation of its own creation, charged with gross abuse and misuser of its powers and franchises, are presented in this information." In *State ex rel. Att'y Gen. v. O'Neill*, 24 Wis. 152, there was a *mandamus* to compel the defendant, as mayor of Milwaukee, to make proclamation that a certain law to establish a board of public works had taken effect by a vote of the people.

In *State ex rel. Gill v. Supervisors of Milwaukee Co.* 21 Wis. 443, a *mandamus* was asked to compel the supervisors to admit to membership and receive the vote of one Welch as a supervisor. The questions were whether the *apportionment law* of 1866 legislated said Welch out of office as supervisor, and whether the law was valid if it had such an effect, and whether further legislation was not necessary to cure the mischief. The supervisor districts were the assembly districts, and the apportionment law so changed the assembly districts as to cause Welch to be a nonresident of

the district in which he was elected. No question was made of the jurisdiction of the court on the sole relation of the attorney general. The apportionment law, as to its effect, was treated as any other act of the legislature. In connection with this case, the case of *Slauson v. Racine,* 13 Wis. 398, may be cited. In that case the act annexing territory to the city changed the boundaries of an assembly district according to the previous *apportionment* law. Its constitutionality was questioned for that reason, and the question was whether any change in the apportionment could be made intervening the five years fixed by the constitution.

*State ex rel. Att'y Gen. v. Conklin,* 34 Wis. 21, was brought on the sole relation of the attorney general, in *quo warranto,* to try the title of the respondent to the office of treasurer of the Saint Raphael's Benevolent Society, a corporation created by a special act of the legislature. *Attorney General v. West Wis. R. Co.* 36 Wis. 466, involved the right to discontinue a part of their road on the route fixed by a law of Congress by the authority of an act of the legislature,— a matter of great public interest. *State ex rel. Att'y Gen. v. W. L. & F. R. P. R. Co.* 11 Wis. 34, was to test the validity of a law in view of the constitutional requirement of a uniform rule of taxation.

Besides the above cases and others brought by the attorney general by virtue of his office, there have been many cases in this court on the relation of private persons in the name of the state, and between individuals, involving also matters *publici juris,* showing the wide range of such matters over which this court has assumed jurisdiction, at least closely analogous to the matters of the present suit.

In *Attorney General ex rel. Bashford v. Barstow,* 4 Wis. 567, this court assumed the jurisdiction of determining who should exercise the functions of the executive office. In *State ex rel. Powers v. Larrabee,* 1 Wis. 200, the constitu-

tionality of an act of the legislature dividing the county of Washington was involved. In *State ex rel. Peck v. Riordan*, 24 Wis. 484, an act of the legislature was declared void because it violated the constitution requiring that there should be but one uniform system of town and county government. *State ex rel. Grundt v. Abert*, 32 Wis. 403, was a similar case. It will be observed that this constitutional provision is that the system of town and county government "shall be as nearly uniform as *practicable.*" This would seem to leave to the legislature at least a margin for the exercise of legislative discretion; and yet this court, in cases where there was a material departure from this constitutional requirement, has not hesitated to declare the acts void. In *Dells v. Kennedy*, 49 Wis. 555, the registry law was declared unconstitutional on the ground that qualified electors might thereby be debarred from casting their votes. This court recently assumed jurisdiction of a *mandamus* case, to determine who was elected a member of the senate and had the right to the certificate of the office.

In *State ex rel. Bell v. Harshaw*, 76 Wis. 230, there was a *mandamus* to compel the state treasurer and secretary of state to apportion and pay over certain moneys in the treasury. In *State ex rel. Anderson v. Timme*, 70 Wis. 627, a *certiorari* was allowed to obtain the record of the school commissioners in the case of the annulment of a patent. In *State ex rel. Abbot v. McFetridge*, 64 Wis. 130, there was a *mandamus* to compel the treasurer to pay back license moneys wrongfully collected. In *State ex rel. Anderson v. Timme*, 60 Wis. 344, a *mandamus* was granted to compel the commissioners of the public lands to annul a patent. These last cases show also that the official action of these state officers may be judicially controlled in all matters ministerial or administrative; and there can be no question but that the duties of the secretary of state in giving

out the notices of an election under the last apportionment act are of this character.

The cases in this court in which various acts of the legislature have been declared void for being in conflict with the constitution are almost numberless; and there never has yet been found a single exception on account of the subject matter of the act. This jurisdiction is so inherent and universal in all the courts of last resort in this country that it may well be asserted that this court is vested by the constitution itself with the prerogative judicial power to protect it from violation by its final judicial decisions. This power is lodged nowhere else. To this department of the government alone is committed this high trust. It has never been abused, and never will be. It acts within well-defined limits and the strictest rules of judicial rectitude.

It is argued by the learned counsel of the defendant that if we assume jurisdiction in this case this court will invade the province of legislation and place the court above the legislature. It is above the legislature, so far as it has the judicial power to declare its acts unconstitutional and void. It is an independent and co-ordinate department of the government, and the only one having this judicial power. It has the power, which is vested in no other department, to declare and administer the laws. An unconstitutional act of the legislature is no law. It is absolutely void. How, then, can this court declare what the statutory law is, without first determining whether it conflicts with the constitution? Without this power, this court would have no judicial functions whatever, and would be a useless appendage of the government.

To repel the suspicion even that this court in the above cases has usurped a power that it does not constitutionally possess, it is proper to consult the decisions of the highest courts elsewhere on the question. That we may not lose sight of the real question, before proceeding further we

again quote the terse language of Chief Justice RYAN in *Attorney General v. Eau Claire*, 37 Wis. 400: "The question on which the exercise of jurisdiction here must turn is whether the subject matter of the writ is one *quod ad statum reipublicæ pertinet*, one affecting the sovereignty of the state, its franchises or prerogatives, or the liberties of the people." We may be permitted to make an extended extract from the opinion in *Houston v. Moore*, 5 Wheat. 1, because it fully expresses, once for all, the jurisdiction of this court: "By a course of judicial decisions reaching from the earliest history of American government to the present day, without a dissenting voice, it has been adjudged that courts of justice have the right and are in duty bound to test every law by the constitution as the fundamental and paramount law of the land, governing all derivative power and the exercise thereof. The judicial department, with us, is the proper power under the constitution to declare the constitutionality of a law; and every act of the legislature contrary to the true intent and meaning of the constitution will be declared by the courts null and void and of no effect whatever. To contend that this is not so would be to assert that the legislative branch of the government is supreme in its authority."

In Brown on Jurisdiction it is said: "The judicial department is formed for the purpose of interpreting the laws and holding them within the limits fixed by the fundamental or constitutional rules." Page 41, § 15. In *In re Ruan's St.* 132 Pa. St. 257, it is said that "the question of the constitutionality of a law is purely judicial and cannot be left to the legislature." Commissioners appointed under an act of the legislature for the purpose of creating a new county, which is held to be in violation of the constitution of the state, may be perpetually enjoined from proceeding. *Bradley v. Commissioners*, 2 Humph. 428. "Whether a given enactment is constitutional involves interpretation

and construction — the exercise of purely judicial functions. . . . Whether the legislature has transcended its power and passed an act in conflict with the constitution is essentially a question of law, and must necessarily be passed upon by the courts." *State ex rel. Pell v. Newark,* 40 N. J. Law, 71. The constitutions of Massachusetts and New York provide that an apportionment shall not be changed until after the next federal enumeration. When the legislature had violated this provision and changed the apportionment the courts of those states assumed jurisdiction to declare their acts unconstitutional and void. *Opinion of Judges,* 6 Cush. 575, 578; *Warren v. Charlestown,* 2 Gray, 84; *Kinney v. Syracuse,* 30 Barb. 349; *People ex rel. Att'y Gen. v. Holihan,* 29 Mich. 116, and *People ex rel. Att'y Gen. v. Bradley,* 36 Mich. 447, were such cases. These cases involved the discretion and *political* power of the legislature as much as this case, and are in point.

In *State ex rel. Gardner v. Newark,* 40 N. J. Law, 297, the supreme court assumed jurisdiction to pass upon the constitutionality of an apportionment act of the legislature in respect to constitutional provisions similar to ours, and held it valid. In *State ex rel. v. Campbell,* 48 Ohio St. 435, the court entertained jurisdiction to pass upon the constitutionality of the apportionment of that state, and held it valid, but said, in effect, that the legislature "might so far overstep the constitutional *limits* in making an apportionment that the court would decree it a nullity." In *State ex rel. Evans v. Dudley,* 1 Ohio St. 437, the constitutionality of an apportionment act was considered by the court. In *State ex rel. Singleton v. Van Duyn,* 24 Neb. 586, the court took original jurisdiction to issue a *mandamus* to compel the county clerk to post notices of election under the apportionment of 1881, instead of that of 1887, on the ground that the latter act was unconstitutional. This case is in point, both as to the jurisdiction of the court as to the subject mat-

The State ex rel. Attorney General vs. Cunningham.

ter and as to the officer subject to the writ. The clerk *there* and the secretary of state *here* had the same duty to perform. In *Prouty v. Stover*, 11 Kan. 235, the action for a *mandamus* was brought purposely to test the constitutionality of an apportionment act, and the case was disposed of on its merits, and the law held valid. In *State ex rel. Att'y Gen. v. Francis*, 26 Kan. 724, the constitutionality of an apportionment act was fully considered. In *People ex rel. Bokkelen v. Canaday*, 73 N. C. 198, the constitutionality of an apportionment act was not only considered, but the act was held unconstitutional because it was not " according to the popular vote *as near as may be.*"

It was never questioned in these cases but that the question of the constitutionality of an apportionment act was purely a judicial one, and the passage of such an act was the exercise of a legislative, and not of a political, power. These last cases are in point, as well as that of *Slauson v. Racine*, 13 Wis. 398, that this court may pass upon the constitutionality of an apportionment law. In the following cases the legislature itself has deemed it to be a judicial question, to be decided by the courts, and has submitted the constitutionality of apportionments to the decision of the judges. See *Opinions of the Justices* in 3 Me. 477; 18 Me. 458; 33 Me. 587; 7 Mass. 523; 15 Mass. 537; 3 Pick. 517; 23 Pick. 547; 6 Cush. 575; 10 Gray, 613; *Henshaw v. Foster*, 9 Pick. 312; *Capen v. Foster*, 12 Pick. 485; *Warren v. Charlestown*, 2 Gray, 84; *Stone v. Charlestown*, 114 Mass. 214. The only three cases in which it is even intimated that the court has not jurisdiction in such a case are the *Opinions of the Justices* in 142 Mass. 601, and 10 Gray, 613; and *Wise v. Bigger*, 79 Va. 269. There was no argument of the question in these cases, and in the last the question was not in the case at all.

The learned counsel of the state have submitted very able and elaborate arguments, sustained by authorities, to the

effect that the enactment of such a law is not the exercise of the political, but of the legislative, power of the legislature. But it seems to be too plain to admit of an argument, that the apportionment law is like all other laws which this court has declared unconstitutional. It is precisely of the same nature of an act to divide or organize a county or to establish a system of town and county government or to make an election or registry law or tax law. It is essentially a law of the legislature, involving the exercise of the same power as other laws. The injunction asked goes to the secretary of state, to restrain him from giving the notices of an election under and according to said apportionment act. It will not restrain him from giving the election notices required by the general statutes under any other apportionment. He is to be restrained from so far carrying out a void law, which is no law. It relates only to his ministerial duty of giving notices. He is not the real party in interest, or the object of the action, and such notices are not the subject matter of the action. He acts only in a subordinate and ministerial capacity under the law, which is the source of the public wrong and injury to be prevented by the injunction against him. He is the only agency by which this law can be executed or carried into practical effect, and the only agency through whom its execution can be prevented. An injunction against him is necessary and preliminary to the jurisdiction of the court over the real subject matter of the action, to prevent the public injury pending the action.

This preliminary jurisdiction is only ancillary to the jurisdiction of the court to declare the law unconstitutional. In giving out election notices there is the exercise of neither judgment nor discretion. Even the governor, with other state officers, having a similar ministerial duty to perform, will be enjoined from carrying out an unconstitutional law. *Board of Liquidation v. McComb,* 92 U. S. 531; *Osborn*

*v. Bank of U. S.* 9 Wheat. 738; *Davis v. Gray*, 16 Wall. 203.

We have already referred to several cases in this court in which these prerogative writs have been served upon the officers of state as the nominal defendants, through whom alone the mischief could be reached; and it is no longer an open question in this court. We have already shown that the court has original jurisdiction in all cases *publici juris*, brought by the attorney general on his own relation, and " wherein the prerogatives and franchises of the state in its sovereign character might require the interposition of the highest judicial tribunal to preserve them." The question remains to be considered whether this is such a case.

The constitution provides that "the legislative power shall be vested in a senate and assembly." Art. IV, sec. 1. These bodies can only exercise this power rightfully when they are created and established according to the constitution. When thus organized, they may exercise this high prerogative of legislation. But if they have not been created according to the constitution, they are foreign, usurping bodies, that cannot rightfully exercise this great power; and to that extent the state government is revolutionized and emasculated of this high prerogative. The constitution further provides the manner in which these bodies may be formed: *First.* "The legislature shall apportion and district anew the members of the senate and assembly [after each enumeration] according to the number of inhabitants" (with certain exceptions). *Second.* The assembly "districts are to be bounded by county, precinct, town, or ward *lines*, to consist of contiguous territory, and be in as compact form as practicable." *Third.* The senate districts must be " of convenient and contiguous territory," and shall not divide assembly districts. *Fourth.* The members of the senate and assembly must be elected by single dis-

tricts thus formed.   This is the only method prescribed by the constitution for the creation of the legislature of the state.   A legislative body formed in violation of these constitutional restrictions is a body unknown to the constitution, and cannot rightfully exercise this high prerogative of legislation.   It is said that these restrictions have nearly all been violated by an attempted creation of future legislatures.   It would seem that these legislative prerogatives of the state now require the interposition of this highest judicial tribunal to preserve them.   The state and the people of the state would seem to be more interested in the integrity of this department of the government in this exigency, and in view of the threatened danger to our institutions, than in any matter of public concern that has ever arisen in the state.   But of course, on grounds of public policy, the acts done and the laws passed by such a legislature would be *de facto* as binding and obligatory as those of any other legislature.   This court once saved the state from the usurpation of the executive department of the state,— a matter of far less public interest and importance than this threatened usurpation of the legislative department of the state.   This matter of such supreme importance to the people of the state may well appeal to the original prerogative jurisdiction of this court, as said in *Attorney General v. Blossom*, 1 Wis. 317, "to shield the sovereignty of the state itself from violation."

But, again, this apportionment act violates and destroys one of the highest and most sacred rights and privileges of the people of this state, guaranteed to them by the Ordinance of 1787 and the constitution, and that is " *equal* representation in the legislature."   This also is a matter of the highest public interest and concern to give this court jurisdiction in this case.   If the remedy for these great public wrongs cannot be found in this court it exists nowhere.   It would be idle and useless to recommit such an apportion-

ment to the voluntary action of the body that made it. But it is sufficient that these questions are judicial and not legislative. The legislature that passed the act is not assailed by this proceeding, nor is the constitutional province of that equal and co-ordinate department of the government invaded. The law itself is the only object of judicial inquiry, and its constitutionality is the only question to be decided.

The particulars in which the constitution has been violated by this act will be more fully considered by my brethren. It is proper to say that *perfect exactness* in the apportionment according to the number of inhabitants is neither required nor possible. But there should be as close an approximation to *exactness* as possible, and this is the utmost limit for the exercise of legislative discretion. If, as in this case, there is such a wide and bold departure from this constitutional rule that it cannot possibly be justified by the exercise of any judgment or discretion, and that evinces an intention on the part of the legislature to utterly ignore and disregard the rule of the constitution in order to promote some other object than a constitutional apportionment, then the conclusion is inevitable that the legislature did not use any judgment or discretion whatever. The above disparity in the number of inhabitants in the legislative districts is so great that it cannot be overlooked as mere careless discrepancies or slight errors in calculation. The differences are too material, great, and glaring, and deprive too many of the people of the state of all representation in the legislature, to be allowed to pass as mere errors of judgment. They bear upon their face the intrinsic evidence that no judgment or discretion was exercised, and that they were made intentionally and wilfully for some improper purpose or for some private end foreign to constitutional duty and obligation. It is not an " apportionment " in any sense of the word. It is a direct and

palpable violation of the constitution. The breaking up of the lines and boundaries of counties by the new assembly districts must have been intentional. It was not necessary in a single instance, and there is no possible margin for the exercise of any legislative discretion. This is a most important restriction on the power of the legislature to make an apportionment. The people have a commendable pride in their own counties, and have more or less a common feeling and interests, and participate together in all their county affairs. They have a right to be represented by their own members of the legislature, and the members themselves can better represent them and promote and protect their interests. They know each other, and have closer relations with each other. These considerations, though common, must not be underrated or overlooked. When these restrictions were under discussion in the constitutional convention, they were supported and adopted upon the express ground that they would prevent the legislature from *gerrymandering* the state. These restrictions were regarded by the very able members of the convention as absolutely necessary to secure to the people that sacred right of a free people,— of equal representation in the legislature. The right of the people to make their own laws through their own representatives, so fundamental in and essential to a free government, the convention sought to guard by these restrictions. That most dangerous doctrine, that these and other restrictions upon the power of the legislature are merely *declaratory*, and not *mandatory*, should not be encouraged even to the extent of discussing the question. The convention, in making a constitution, had a higher duty to perform than to give the legislature advice. Judge Cooley, in his great work on Constitutional Limitations, says: " The courts tread upon very dangerous ground when they venture to apply the rules which distinguish be-

tween directory and mandatory statutes to the provisions of the constitution."

We have attempted to show that this court has jurisdiction of the subject matter of this action to declare the said apportionment act unconstitutional and void, and to enjoin the secretary of state from giving the notices of the election for members of the senate and assembly under the same. We hold, therefore, according to the complaint,— *First*, that the court has jurisdiction of the subject matter of this action; *second*, that it has the judicial power to declare said apportionment act unconstitutional, and to set it aside as absolutely void; *third*, that the duty of the secretary of state in giving out notices of election is purely ministerial, and may be controlled and restrained by injunction; *fourth*, that the apportionment act is like any other act of the legislature, and is passed by the legislature in the exercise of its legislative power; *fifth*, that the restrictions on the power of the legislature to make an apportionment, found in sections 3, 4, and 5 of article IV of the constitution, are mandatory and imperative, and are not subject to legislative discretion; *sixth*, that said apportionment act is in conflict with these restrictions, and in violation of the constitution, and is therefore void. ·

The motion in the nature of a demurrer is overruled, and the defendant has leave to answer within twenty days. The decision of the court is unanimous. The Chief Justice and Justice PINNEY will file separate opinions.

PINNEY, J. In view of the gravity and importance of the case, and of the fact that it has been the subject of careful and anxious consideration on the part of the court, I have thought it not unbecoming to state the reasons which compel me to concur in the decision of the court overruling the defendant's motion to dismiss the cause.

I. A careful consideration of previous decisions of this court, and the application of well-settled principles of law and of statutory and constitutional construction, will, I am convinced, dispel the doubts and difficulties which have been suggested in regard to the form of the proceeding, the jurisdiction of the court, and the substantial merits of the controversy before us. The suit is one instituted in this court in the name of the state by the attorney general, upon leave granted, in relation to a matter of public concern, involving the rights and liberties of the people of the state, concerning matters strictly *publici juris*, and in which no one citizen has any special or peculiar right or interest to be protected or vindicated other than that which is common to citizens in general, and in relation to which no private person can have or maintain an action, and no suit or proceeding can be maintained save in the name of the state, prosecuted by the attorney general. This consideration, of itself, at the outset, suffices to dispose of the first ground assigned in the respondent's motion to dismiss,— that the information states no fact showing the relator to have any interest in the subject matter thereof which entitles him to any standing in a court to petition for relief from grievances real or supposed.

This suit is in substance and form the suit of the state of Wisconsin, as a political body, on the information or relation of the attorney general, the proper law officer of the state, made upon complaint to him by a private citizen. It is not essential to the jurisdiction of the court that beyond the attorney general there should be any private relator; and the connection of a private relator with the suit is that only of being liable for costs in case it turns out that it was wrongly instituted or is improperly prosecuted. When a suit immediately concerns the crown or government alone, the attorney general or solicitor general proceeds purely by way of information. When it does not immediately con-

cern the rights of the crown or government, its officers depend on the relation of some person whose name is inserted in the information, and who is termed the relator.    And as the suit, though in the name of the attorney general or solicitor general, is then carried on under the direction of the relator, he is considered as answerable to the court and to the parties for the propriety of the suit and the conduct of it; and he may be made responsible for costs if the suit should appear to have been improperly instituted or in any stage of it to be improperly conducted.    Still, however, a relator in such cases is by no means indispensable; and the attorney general may, if he pleases, proceed in the suit without one.    Sometimes it happens that the relator has an interest in the matter in dispute, in connection with the crown or government, of an injury to which he has a right to complain.    In such a case his personal complaint is joined to and incorporated with the information given to the court by the officer of the crown or government, and then they form together an information and bill, and are so termed.    Story, Eq. Pl. § 8, *ut supra;* Mitf. Eq. Pl. 117, 118; *Attorney General v. Vivian,* 1 Russ. 236, 237.    If it appeared that the relator had no interest, the bill was dismissed, but the information was retained.

Where the object is the enforcement of a *public* right, the people are regarded as the real parties, and it need not appear that the relator has any interest in the result. This is familiar doctrine.    *Pike Co. Comm'rs v. State,* 11 Ill. 202; *People ex rel. Stephens v. Halsey,* 37 N. Y. 348. The rule that the relator in the writ of *mandamus,* as it is sometimes stated, must show a special, individual right to the relief sought, applies only to cases where individual interests are alone involved, and not to cases where the interest is public and general, and on the information and at the instance of the attorney general, such as this has become by his adoption and official presentation of it, which

must necessarily be based upon a public grievance. *Attorney General ex rel. Muskegon B. Co. v. Evart B. Co.* 34 Mich. 472; *Attorney General v. Parker*, 126 Mass. 221; *Attorney General v. Butler*, 123 Mass. 304; *Attorney General v. Barker*, 4 Mylne & C. 262. In the case of *State ex rel. Drake v. Doyle*, 40 Wis. 185, where it was stated that the relator had compromised the controversy and had no further interest in the question and no further right to the writ of *mandamus* sought, that fact was held immaterial; and it was held that the question before the court was not upon the private right of the relator, and was independent of the accident that there was a relator in the case, and that the question on which the exercise of jurisdiction must turn was whether the subject matter of the writ was one "*quod ad statum reipublicæ pertinet;* one affecting the sovereignty of the state, its franchises or prerogatives;" that "it is very certain that it concerns the state at large, that one of its principal officers executes his office in positive and deliberate disregard of a public statute defining its duties." Pages 186, 187. And, notwithstanding the withdrawal of the relator, the court proceeded to the full and final exercise of its original jurisdiction. *Attorney General v. Railroad Cos.* 35 Wis. 425. It is evident, therefore, that the objection of a want of interest or title to relief in the private person on whose complaint the attorney general has based his information, is without foundation and cannot be allowed.

II. The information being for what is alleged to be a meditated or threatened public grievance, and it not being necessary that there should be a private relator, or, if there is one, that he should have any special personal interest in the subject matter of the suit or the relief sought except that which he has in common with other citizens of the state, we come to consider the second objection,— that the court has no jurisdiction of the subject matter of the suit;

and that the recitals and averments in the information state no wrongs, real or supposed, cognizable in a court of equity. And under this head, as going to the jurisdiction of the court, various propositions are urged, the principal one of which is that the information does not present any fit matter of judicial cognizance, or make or state a case in relation to which the court can lawfully render or make any judgment or decree.

At the argument, respondent's counsel was not understood to, and did not, attack or question in the least the former decisions of this court on the subject of its original jurisdiction of the writ of injunction for prerogative purposes, given by the constitution, upon information in equity, as a means of using such writ; nor did he question the right of the court to declare an act of the legislature in violation of the constitution void if the question is presented in some proper judicial proceeding. But the contention was that the entire scope of the suit was to bring in question an exercise of a *political* power by the legislature in passing the recent act of apportionment of the state into senate and assembly districts (ch. 482, Laws of 1891); that the question presented is wholly a *political* one, and not a fit matter for the consideration and decision of a court of justice.

The subject matter of this suit is not a controversy with the act of 1891; it is a controversy with a party,— the secretary of state; not with an officer vested with any *political* or *discretionary* power whatever in relation to the apportionment of the state into senate and assembly districts, or with the execution of the act in question, or with the election of senators and assemblymen, but with an official whose duty in the respect in question is purely ministerial, and whose official acts of that character this court has on numerous and notable occasions directed and controlled by appropriate prerogative writs. In brief, the claim of the respondent is that the

court has no power to restrain his official conduct in rela-
tion to duties of a mere ministerial character when acting,
or claiming to act, under an act of the legislature alleged
and found to be unconstitutional. The extraordinary char-
acter of the contention, in view of a long and uniform course
of decisions in this court, and the serious and momentous
consequences which would ensue from a doctrine of such
alarming and dangerous tendency, has induced an unusually
cautious and careful consideration of the question of the
jurisdiction of the court in the pending suit.

There is neither occasion nor disposition to review or re-
consider or modify in the least the former decisions of
the court on the subject of its original jurisdiction, from
the case of *Attorney General v. Blossom,* 1 Wis. 317, to the
present time. In the case of *Attorney General v. Railroad
Cos.* 35 Wis. 425, and subsequent cases in his time, that
eminent jurist and great lawyer, Chief Justice RYAN, dis-
cussed the entire subject in his usual vigorous and lumi-
nous manner, and the court fully settled the scope and limits
of its jurisdiction. To the many able and exhaustive opin-
ions on that subject nothing can be profitably added or
properly taken away. By the decisions referred to it has
been settled that this court is a court of first resort on
all judicial questions affecting the sovereignty of the state,
its franchises or prerogatives, or the liberties of its peo-
ple. That it has original jurisdiction of the writ of in-
junction as a *quasi* prerogative writ, where that is a proper
remedy, in matters *publici juris,* within the scope of its
jurisdiction, upon the information of the attorney general.
That " where there is nonfeasance, *mandamus* compels
duty; where there is malfeasance, injunction restrains
wrong; and so near are the objects of the two writs that
there is sometimes a doubt as to which is the proper one.
Injunction is frequently mandatory, and *mandamus* some-
times operates restraint." That " the prerogative writ

proper can issue only at the suit of the state or the attorney general in the right of the state, and *so it must be that the writ of injunction in its use is a clear prerogative writ. . . . It is the duty of the court to confine the exercise of its original jurisdiction to questions publici juris.*" In the case of *Attorney General v. Railroad Cos.* the applications for injunctions, which were sustained, were to restrain the several companies from exacting tolls for the carriage of passengers or freight in excess of the maximum rates established by the statute, or, as was said in this case, to compel corporations created by the state to obey its laws. If the court can take jurisdiction and grant its injunction to compel a creature of its creation to obey the law, no reason is perceived why it may not, for like public purposes, compel an officer of the state, deriving all his powers from the constitution and laws, and with no authority to do any act except in conformity with them, from doing an unauthorized act in relation to a matter of public interest, concerning which his duties are purely ministerial.

In *Attorney General v. Eau Claire*, 37 Wis. 400–442, it was held that it is not enough to put in motion the original jurisdiction of this court that the question is *publici juris*, but it should be a question affecting the sovereignty of the state, its franchises or prerogatives, or the liberties of its people. And in that case the court interfered by injunction to prevent the operation of a law which was unconstitutional, for the construction of certain works in the Chippewa river, for the reason that it was a violation of the sovereign rights of the state over that river as a navigable stream; that, " without counting convenience or inconvenience, it was the duty of the court, in a proper case, to interpose the prerogative writ of the state to secure the prerogative right of the state from infringement." In *State ex rel. Drake v. Doyle*, before referred to, this court issued a peremptory *mandamus* to the secretary of state to

compel him to revoke a license to an insurance company after the relator had withdrawn from the case, with the declaration "that the writ in this case will issue in the right of the state at any hazard to its officer. We apprehend, however, that there will be none. The state officer is bound to obey the state authority." So, also, the writ has been issued to the secretary of state to compel him to audit a claim against the state (*State ex rel. Sloan v. Warner*, 55 Wis. 271), and to the secretary of state and state board of canvassers in relation to the canvass and declaration of result of votes cast at a general election. In *Kerr v. Trego*, 47 Pa. St. 295, it was held that the remedy by injunction "extends to all acts that are contrary to law and prejudicial to the interests of the community, and for which there is no adequate remedy at law."

It would be unprofitable to cite the numerous instances of the exercise of the original jurisdiction of the court in cases against different administrative officers of the state and county and other officers relating to the performance of their merely ministerial duties. The cases cited are of both classes,— of *mandamus* to compel action, and injunction to restrain it. The jurisdiction is clearly granted by the constitution as indispensable to a proper administration of the government and of public duties of an important character, and its existence admits now of no question whatever. It has not been contended, nor can it be maintained, that either of these writs can go to control or restrain any public officer in the exercise of a political or discretionary power. On the contrary the authorities are decisive, and too numerous for citation, that in the latter class of cases these writs cannot lawfully be issued; but it has been already shown, and it was not disputed at the argument, that the duties of the secretary of state in relation to the matters stated in the information are purely and solely of a ministerial nature.

The case presented by the information in substance is that at the session of the state legislature after the last enumeration of the inhabitants taken by the authority of the United States there was passed an act for apportioning and redistricting the state into senate and assembly districts, known as " Chapter 482, Laws of 1891; " that the respondent is secretary of state, and as such has recognized and treated this act as a valid and binding law, and filed it as such in the archives of the state department, and published it in the volume of laws required by law to be published; that at the next general election, November 8, 1892, there is to be elected one member of assembly for each assembly district in the state, and one senator from each of the even-numbered senate districts; that, by the third section of this act, it is required that they be elected from such districts as are constituted by said act; that the respondent threatens and gives out that he will make and issue the election notice for such election, and specify therein the said senate and assembly districts, as mentioned in said sec. 3, and as the same are attempted to be created by said ch. 482, and will, as such secretary of state, publish a copy of such notice in a newspaper printed at the seat of government once in each week from the date of said notice until the election to which it refers ·is held, and will transmit a like notice to the county clerk of each county in which the election is to be held, and will, if a senator, specify the number of the district; that there is no law authorizing any such contemplated action on his part, the said ch. 482, Laws of 1891, being void by reason of its conflict with the constitution of the state; that, unless restrained from the performance of such illegal act in notifying such election, said election will be held for senators and members of the assembly in and for the districts created or attempted to be created by said act, in which event the inhabitants of the state will be greatly injured in their po-

litical powers, rights, and liberties guarantied to them by the constitution; that unless relief be afforded by this court there is no satisfactory or adequate protection for the rights and liberties of the people against such threatened invasion of them; and a perpetual injunction is asked, restraining the respondent as secretary of state, and his successors in office, from making, giving, publishing, or delivering notices of election of members of the senate and assembly, describing the said senate and assembly districts as they are attempted to be created by ch. 482, Laws of 1891, and for such other and further relief, etc. The case made, in brief, is that the respondent intends and threatens that, in the discharge of the duties devolved upon him by law (sec. 17, R. S., as amended by sec. 1, ch. 327, Laws of 1883) in notifying the coming election for senators and members of assembly, he will describe in such notices districts in and for which senators and members of assembly are to be elected, which have no legal existence as such single and separate districts or constituencies, in violation and to the great prejudice of the rights and liberties of the people of the state as secured to them by the constitution.

We have here a controversy existing in relation to the performance by the respondent of an important official duty, of a purely ministerial nature, in which all the people are deeply interested, and affecting their constitutional rights and liberties. This controversy is not, in a legal point of view, in any respect different from a great number of other questions which have arisen in the past concerning the performance of the ministerial duties of the secretary of state and of other administrative officers, which have been adjudicated by the court without creating any suspicion that the court, in acting upon them, was exceeding its authority or acting otherwise than in the lawful exercise of its constitutional jurisdiction "to issue writs of *habeas corpus,*

*mandamus,* injunction, *quo warranto, certiorari,*" etc., and " to hear and determine the same."

We have then only to inquire: *First,* whether the matter in controversy involves such questions. *Second,* whether the controversy is with a party against whom the court may direct and enforce its coercive powers to enforce its judgment or decree.

The controversy in this case is with the secretary of state, and not with the chapter 482 which he intends to execute. The proceeding is against him, not against the act nor against the legislature. No one contends, so far as I am aware, that the court, by any process, direct or indirect, can exercise any appellate or supervisory power by way of review of the acts of the legislature, or that the court may in any way or manner sit in judgment upon any of its acts relating to matters of legislative *discretion,* or within its political power, or in respect to which its power is not restricted or limited by the constitution. The position asserted by the court is that in any controversy of a judicial nature, properly brought before the court, in which the validity of an act of the legislature is challenged on the ground that it is in conflict with the constitution, the court has the constitutional and rightful authority to decide whether the act is void or not for that reason, and that its decision on that question is final and conclusive in all courts and places, and against all persons, whether acting in an official capacity or otherwise. It is to be presumed that no intelligent lawyer is to be found at this day who will assert the contrary, nor was this position really questioned at the argument. The respondent relies upon chapter 482 as his authority for the course which he gives out that he intends and threatens to pursue in the matter of notifying the approaching election. In this manner the validity of the act is, in a legal sense, brought in question collaterally or incidentally, though

the *res* or subject matter of the information is the alleged meditated and threatened illegal and unauthorized course of action of the respondent. This, and this only, is the subject of the suit, and not chapter 482, although in a prac- tical point of view the decision will result in holding the act either valid or void. Coming before the court as it does, in the manner and for the purpose stated, the ques- tion arises in the determination of a *judicial* controversy existing with the respondent as to his proposed conduct, and it is clear that the court must have the power to decide upon the validity of the act in order to decide the case before it.

Whether the matter in controversy affects the sover- eignty of the state, its prerogatives and franchises, or the liberties of the people, will be best determined by a brief reference to the leading features of our American system of popular representative government, designed to be con- served and protected by the provisions of the state consti- tution in question. A general statement of some of the principal features of this system will prove instructive and appropriate, particularly as it is contended that the contro- versy here presents only a question of the exercise of *polit- ical* power, and that therefore it is not a *judicial* one.

The clearest and most concise analysis of the general features of our political system may be found in the cele- brated argument of the eminent statesman and great con- stitutional lawyer, Mr. Webster, in the case of *Luther v. Borden*, 7 How. 1, in the supreme court of the United States, which arose out of what is known as the "Dorr Re- bellion." He said, in substance, that the only source of political power is in the people; that they are sovereign, that is to say, the aggregate community, the accumulated will of the people, is sovereign, but *that is not the sover- eignty* which acts in the daily exercise of sovereign power. The people cannot act daily, as the people. They must

establish a government, invest it with so much of the sovereign power as the case requires; and this sovereign power being delegated and placed in the hands of the government, that government becomes what is familiarly called the *state*. The next principle is that, as the exercise of legislative power and the other powers of the government immediately by the people themselves is impracticable, they must be exercised by representatives of the people. The basis of this representation is suffrage. The right to choose representatives is every elector's part in the exercise of sovereign power. To have a voice in it, if he has the proper qualifications, is the portion of political power belonging to every elector. That is the beginning. That is the mode in which power emanates from its source and enters into the hands of conventions, legislatures, courts of law, and the chair of the executive. Suffrage is the delegation of the power of an individual to some agent. Then follow two other great principles of the American system. The first one is that the right of suffrage shall be guarded, protected, and secured against force and against fraud; and the second is that its exercise shall be prescribed by previous law,— that every man entitled to vote may vote; that his vote may be sent forward and counted, so that he may exercise *his part* of sovereignty in common with his fellow-citizens. There is another principle equally true, that the people often limit themselves, and set bounds to their own power, to secure the institutions which they have established against the sudden impulses of mere majorities, and also that they may limit themselves by their constitutions in regard to the qualifications of the electors and the qualifications of the elected. Webster's Works, vol. 6, pp. 221–227, cited by the court with approval in *In re Duncan*, 139 U. S. 461. See *Vanhorne's Lessee v. Dorrance*, 2 Dall. 308.

In the organization of the government into three depart-

ments, each measurably independent of the other,— the executive, judicial, and legislative,— the political power of the state was vested in the executive and legislative departments, and the judicial power in the courts. The *political* organization called the " state " is created for the protection and enforcement of the rights and liberties of the people. Its sovereignty or power of rightful control is for the protection of personal and of political rights as well. Prominent among these rights and liberties is the right of citizens to participate in the election; to have their proper voice and influence and just representation in the representative branch of the government as members and as possessors of the sovereignty vested in the people outside of the constitution and not delegated by it. It is this sovereignty, these rights, these privileges and liberties, of the people, which this court, by virtue of its prerogative jurisdiction, has an undoubted right to protect and enforce, as against unconstitutional and illegal attack from all sources whatever. Chief Justice RYAN, in *In re Ida Louisa Pierce*, 44 Wis. 431–443, speaking of the original jurisdiction of the court and the purposes for which it exists, uses the following pertinent language on this subject: " The words ' liberties of the people,' in a judicial sense, mean the aggregate political rights and franchises of the people of the state at large. . . . The liberties of the people here and elsewhere are not only essentially subject to the ordinary jurisdiction of the courts, not only unimpaired by them, but are absolutely dependent upon them. The supremacy of original judicial processes enters into the liberties of the people, and is essential to them. Order is essential to all liberty, and judicial supremacy is essential to order."

The state is a sovereign political organization, and its officers owe it, as a duty, to secure and protect these political rights and the liberties of the people; and its citizens have the right to appeal in appropriate instances to the ex-

ecutive, legislative, or judicial departments, as the case may require, for the protection of their liberties, and, beyond all question, to this court, for the exercise of its original jurisdiction to protect them, according to the methods prescribed by law, against the results of all action, whether legislative, executive, or administrative, in violation of the guaranties of the constitution, and which are of a prejudicial and injurious character. No private citizen, it is true, can maintain a proceeding in this or any other court of justice to obtain relief in such a case, because the wrong, whether committed or meditated, is a *public* one and not private in any proper sense; and it is only in the name of the state, or through its attorney general, that adequate relief can be obtained by invoking the jurisdiction vested in this court by the constitution, as a conservative and restraining power, to protect and preserve the government against threatened maladministration and the struggles of partisan strife and factional fury which might otherwise overthrow it.

And here it is fit to observe that perversions of the constitutional rules of apportionment designed to secure a fair and just representation, manifestly tend to, and if unrestrained may in time, work the destruction and overthrow of the system of popular representative government itself. It is to no purpose to say that if the power of representation, by a wrongful and illegal apportionment, has been put in the hands of the minority, whereby they are able to perpetuate their ascendency and power, there is, as was contended in argument, an adequate and appropriate remedy for such wrongs at the ballot box. The case of *Attorney General v. Eau Claire*, 37 Wis. 400, adjudicated after elaborate argument and the fullest consideration, is directly in point. The rights vindicated and protected from the prejudicial effect of an unconstitutional act of the legislature, the operation of which it was sought to restrain in

that case, were not *rights of property or proprietary rights*, in any proper sense, but were rights of sovereignty which the state in its political capacity held and was bound to guard and protect,— rights not other or different in point of law from the rights of the people to have full effect given to the political power of each elector, and a fair and constitutional apportionment of the representative bodies. For, as Mr. Webster well says, " the right to this representation is every elector's part in the exercise of sovereign power. To have a voice in it, if he has the proper qualifications, is the portion of political power belonging to every elector;" and the state and the people have a right to a fair apportionment of the aggregate of the political power, to the end that there may be a just expression of it according to constitutional requirements.

There can be no doubt, however, that there can be no direct judicial remedy, as against an unconstitutional apportionment, even by and through the extraordinary jurisdiction of the court, unless the controversy can be made in some form with and against some officer whose duties are ministerial, and who is therefore amenable to the coercive power of the court to compel execution of its judgment or decree. If the respondent is not, as to the matter in hand, a mere ministerial officer owing mere ministerial duties, if he is vested with political or discretionary power subject to no limitation, the jurisdiction of the court cannot be maintained; for the court will not render a judgment or decree that it has no possible right to enforce. It was on this account that the jurisdiction of the supreme court of the United States failed in the case of *Mississippi v. Johnson*, 4 Wall. 475, and in *Georgia v. Stanton*, 6 Wall. 60. In the former case the court decided that the president of the United States could not be enjoined from carrying into effect acts of Congress alleged to be unconstitutional, on the ground that the duty imposed by the acts in question

on the president was not "in this sense ministerial," that it was "purely executive and political;" that the terms ministerial and executive "are by no means equivalent in import." "The Congress is the legislative department of the government; the President is the executive department. Neither can be restrained in its action by the judicial department, though *the acts* of both, when performed, are in proper cases subject to its cognizance,"— and that "a ministerial duty, the performance of which may in proper cases be required of the head of a department by judicial process, is one in respect to which nothing is left to discretion. It is a simple, definite duty, arising under conditions admitted or proved to exist, and imposed by law," such as the duty of the respondent is in this case. The case of *Mississippi v. Johnson* is an unanswerable authority on this point in support of the jurisdiction here. The court in that case refused to allow the bill to be filed because it was "fully satisfied that the court had no jurisdiction to enjoin the president in the performance of his duties." Another bill against Mr. Stanton, secretary of war, and other officers under him, was accordingly presented, and the court refused to permit it to be filed upon the same grounds, namely, that the bill involved a *political* question, and that in order to entitle the party to an injunction a case must be presented appropriate to the exercise of judicial power; that the rights in danger must be rights of person or property, "not mere political rights, which do not belong to the jurisdiction of a court, either in law or equity;" and inasmuch as the court was called upon to restrain the defendants, who represented the executive authority of the government, from carrying into execution certain acts of Congress, and as such execution would annul and totally abolish the existing state government of Georgia, and establish another in its place, the court refused to permit the bill to be filed.

The passage above quoted from the opinion of Mr. Jus-

tice NELSON in *Georgia v. Stanton*, 6 Wall. 60, has been pressed upon our attention as substantially decisive against the jurisdiction of the court over this information; but, however pertinent it may have been in that particular case, it cannot, we think, have any application here. We do not concede that the exercise of the jurisdiction of this court by writs of injunction and *mandamus* against ministerial officers, under the clause of the constitution giving it original jurisdiction "to issue writs of *habeas corpus, mandamus,* injunction, *quo warranto, certiorari,* and other original and remedial writs, and to hear and determine the same," is the exercise of *political* power. It may well be conceded that courts of equity would not, by reason of their original jurisdiction, have authority to interfere by injunction in a case such as this; but it is to be borne in mind that the writ of injunction under our constitution is put to prerogative uses of a strictly judicial nature, as a remedy of a preventive character in case of threatened public wrong to the sovereignty of the state, and affecting its prerogatives and franchises and the liberties of the people; their rights being protected in this court by information in the name of the state, on relation of the attorney general.

It is to be remembered that the supreme and circuit courts of the United States have no jurisdiction of prerogative writs, except as incident and auxiliary to the exercise of a jurisdiction already otherwise acquired. *Marbury v. Madison,* 1 Cranch, 137; *U. S. v. Schurz,* 102 U. S. 395; *U. S. ex rel. Dunlap v. Black,* 128 U. S. 44, 45; *McClung v. Silliman,* 6 Wheat. 598; *Rosenbaum v. Bauer,* 120 U. S. 453. Cases of the use of prerogative writs against the humblest ministerial officers of the United States can reach the supreme court of the United States only by appeal, after having been instituted and heard in the supreme court of the District of Columbia; and in the cases that do thus reach that court the rule of judicial decision is stated in

*U. S. ex rel. Dunlap v. Black*, 128 U. S. 48, to be that "the court will not interfere by *mandamus* with the executive officers of the government in the exercise of their ordinary official duties, even where these duties require an interpretation of the law, the court having no appellate power for that purpose; but where they refuse to act in a case at all, or where by special statute or otherwise a merely ministerial duty is imposed upon them, that is a service which they are bound to perform without further question, and *mandamus* may issue to compel them."

Inasmuch as the use of the writ of injunction in the exercise of the original jurisdiction of this court is correlative with the writ of *mandamus*, the former issuing to restrain where the latter compels action, it is plain that this case, as against the respondent, is a proper one for an injunction to restrain unauthorized action by him in a matter where his duties are clearly ministerial and affect the sovereignty, rights, and franchises of the state, and the liberties of the people. The jurisdiction of this court to control the official action of public officers in the performance of mere ministerial duties has been liberally exercised in numerous cases for a period of over forty years, and without any apprehension that the court was exercising *political* power or interfering with *political* questions. No reason is perceived for declining the jurisdiction now. It would seem to be a fair test of the question of jurisdiction in this case by injunction, that if the respondent, believing the act to be void and refusing to act under it, was about to proceed to notify the election of members of the senate and assembly under some former apportionment act, if *mandamus* might be resorted to in order to compel him to act under chapter 482 of the laws of 1891, on the assumption that it was valid, injunction, by parity of reasoning, might be granted to restrain action under that act, if found to be void. It is not reasonable to suppose that there would have been the least

The State ex rel. Attorney General vs. Cunningham.

hesitation, in case the respondent had refused to act under chapter 482, to apply for a *mandamus* to have compelled such action, or that it would have been considered that the proposed course of the respondent so far involved a question of political power that the court would not have had jurisdiction to compel him to act under the law, if found valid. The truth is that the power of the respondent to notify elections is in no just sense whatever political; and in view of the purely ministerial nature of his duty, it is a misuse of terms to assert that his power or duty is in any sense political. The act he is required as a ministerial officer to assist in executing by giving the notice, is the *result* of legislative power, and therefore, it may be said, of *political* power; but this does not make the act required of the respondent, in giving or refusing to give the notices, which is a mere consequence of the exercise of political power, a *political* act, so as to prevent judicial examination of his conduct in acting or refusing to act for that reason, if the law is void for conflict with the constitution. Were the case otherwise, no act of the legislature could be questioned for conflict with the constitution, because it could be said in any such case, as appropriately as in this, that the enactment of the law itself was an exercise of political power, and the court could not, therefore, examine it to determine whether it is in conformity with the constitution. Such a contention confounds all distinction between the law itself and mere ministerial acts done or required to be done under it.

It was suggested rather than argued at the hearing that the power of apportioning and redistricting the state into senate and assembly districts is not essentially a legislative power, but rather of an administrative character, and that it is a power entirely within the discretion of the legislature, or at least the court could not disregard their action as erroneous or even as illegal when coming collaterally

and incidentally before it, as it could do in the case of an act of the legislature in conflict with the constitution, and that therefore the court is without jurisdiction; and reference was made to the fact that during the existence of the territorial government the governor apportioned the territory from time to time into legislative districts, and that in some of the states the like power has been delegated to and exercised by administrative officers or local boards possessed of *quasi* legislative powers for some particular purposes. It is sufficient to say on this subject that, the constitution having vested this power in the legislature, they took it, as they did all other power vested in the legislature, as a legislative power, to be exercised as such. Certain it is the legislature cannot delegate it; and by an unbroken usage extending from the organization of the state, more than forty years ago, it has been used and exercised as a legislative power executed in the form of a law, approved by the governor, and published in the general laws. It is not now open to question but that, under the constitution, it is strictly a legislative power, and, when embodied in an act of the legislature, it may be declared void by the court by reason of being in conflict with the constitution. But if it is not strictly a legislative power, if, as counsel contends, it is a mere act of *political power*, upon what possible ground can it be maintained, in the face of the plain provisions of the constitution by which it is limited and restrained, that the delegate in the performance of his trust becomes superior to his creator and may transcend the terms of his commission and disregard its conditions and limitations, and still his act be esteemed valid and conclusive? To so hold would be to declare that the conditions and restraints placed by the constitution upon the exercise of its power, vital to the maintenance and preservation of a popular representative form of government, are only of optional obligation, and that the very

guaranties of its perpetuity may be so wrested from their purpose and perverted as to become the speedy and certain instruments to subvert and destroy it. It is clear to my mind that the restraints and conditions annexed to the power abide with it, and when disregarded it is the right and duty of the court to declare the act void.

We have, then, all the essential elements of a judicial controversy proper for the determination of a court of justice. There is a controversy between the state, as a political organization suing by its attorney general, and the respondent, in relation to the discharge of a purely ministerial duty, concerning matters respecting the sovereignty, prerogatives, and franchises of the state, and the liberties of its people, which is matter cognizable in this court, on information of the attorney general, by virtue of its original jurisdiction; and there is a party respondent whose duty in the premises is in no sense political or discretionary, and who is amenable to the process of the court to enforce obedience to the decree or judgment which it may render, and as against whom the court has ample power for the purpose of determining the question whether the threatened or meditated course of the respondent is rightful or wrongful, and whether he may issue notices of election for senators and members of assembly, describing therein separate districts and constituencies which have, as claimed, no legal existence as such. The provisions of chapter 482, under and according to which respondent proposes to act, come before the court, and the question of the validity of the act arises incidentally and as collateral to the determination of the question in controversy. It is not a question of the validity of chapter 482, in the abstract, that is the subject of jurisdiction, for this would not form of itself a proper subject of jurisdiction, and the determination of the validity of the act is not otherwise involved save as it comes in question in order to decide the contro-

versy before the court, which is solely and only the legality of the proposed action of the respondent.

For these reasons, stated more at length than necessary, I think that in the case of a manifest violation of the limitations of the constitution upon the power of the legislature to pass an act apportioning the state into senate and assembly districts, and distributing between local constituencies the aggregate political power of the electors, the sole remedy is not by an appeal to the magnanimity of those who have committed such a wrong to surrender their power gotten by it, or at the ballot-box, or by revolution, but that the court has, beyond all question, jurisdiction, in a case instituted as this one is, to proceed to its determination and grant the proper remedy.

III. The question whether ch. 482, Laws of 1891, is void for want of conformity to the provisions and limitations of sections 3, 4 and 5, art. IV, of the constitution, presents questions of great interest and of paramount importance, affecting the integrity and stability of our system of popular representative government; and it is impossible to approach its discussion without a deep sense of the grave responsibility devolved upon the court in its decision. The act in question is one which affects or may affect no one particular class of people or locality, but all the people of the state in their collective and individual rights and interests; and it cannot be declared void because it is supposed to violate the natural, social, or political rights of the people, unless it is made to clearly appear that it is violative of rights guarantied or protected by the constitution; nor because it may appear to violate fundamental principles of popular government, unless placed beyond legislative encroachment by that instrument; nor yet because the act may be said to be, in a general sense, opposed to the spirit, not expressed in words, but supposed to pervade the constitution. In order that the court may be justified in de-

claring an act of the legislature void, the repugnance between it and the express provisions of the constitution and those limitations necessarily or conclusively implied from it must be clear and irreconcilable; and in all matters of unlimited discretion, or involving only considerations of public policy, the determination of the legislature is final and conclusive on the courts. Nor will an act be held void by reason of any supposed improper motives or unconstitutional intentions of the legislative body which enacted it. The respect which the court entertains for the legislative department of the government, as well as grave reasons of public policy, alike forbid such an inquiry with a view of defeating the operation of any public legislative enactment. *Fletcher v. Peck*, 6 Cranch, 129. In *Ex parte McCardle*, 7 Wall. 513, the court said: "We are not at liberty to inquire into the motives of the legislature. We can only examine into its power under the constitution." And in *Doyle v. Continental Ins. Co.* 94 U. S. 541: "If the act done by the state is legal, is not in violation of the constitution, . . . it is quite out of the power of any court to inquire what was the intention of those who enacted the law." And in *Soon Hing v. Crowley*, 113 U. S. 703–710, it was held: "The rule is general, with reference to the enactments of all legislative bodies, that the courts cannot inquire into the motives of the legislators in passing them, *except as they may be disclosed on the face of the acts or inferable from their operation, considered with reference to the condition of the country or existing legislation.* The motives of the legislators, considered as the purposes they had in view, will always be presumed to be to accomplish that which follows as the natural and reasonable effect of their enactment;" and "we must not suppose the legislature to have acted improperly, unadvisedly, or from any other than public motives, under any circumstances, when acting within the limits of its authority."

An issue of fact cannot be framed and tried by a jury or otherwise with a view of determining by its result the validity of an act of the legislature, but the court is to be confined to matters of which it may take judicial notice; for otherwise a jury might find on the issue one way to-day, and another way to-morrow, and this would beget a distressing condition of uncertainty. The enumeration made under the authority of the United States in 1890 of the inhabitants in the several minor political divisions of the state, grouped according to the separate districts described in the act, is made an exhibit to and a part of the information. It seems to be well established that courts will take judicial notice of a census, whether taken under the authority of the state or United States. *State ex rel. Board v. County Court,* 89 Mo. 237; *Temple v. State,* 49 Am. Rep. in note, 201; 24 Am. Law Reg. 568; *Geraghty v. Ashland Co.* 81 Wis. 36; *State ex rel. Terry v. Keaough,* 68 Wis. 142. The apportionment is to be "according to inhabitants," and made at the next session after the state or United States enumeration, and the enumeration is evidently intended as the basis of apportionment. The court will take judicial knowledge of the location, general boundaries, and juxtaposition of the several counties, towns, and wards mentioned in the act in question, and of matters of common knowledge. *Brown v. Piper,* 91 U. S. 37; *King v. Gallun,* 109 U. S. 101.

It was contended on behalf of the state that the provisions of sec. 2 of the Ordinance of July 13, 1787, for the government of the Territory of the North-West, that "the inhabitants of said territory shall always be entitled to the benefits . . . of a proportionate representation of the people in the legislature," which is embraced in and continued in the organic act of the territory of Wisconsin by sec. 4, providing that "an apportionment shall be made, *as nearly equal as practicable, among the several counties,* for the election of the council and representatives," and by sec.

12, providing that " the inhabitants of said territory shall be entitled to and enjoy, all and singular, the rights, privileges, and advantages granted and secured to the people of the territory of the United States northwest of the Ohio," by the Ordinance of July 13, 1787, had the effect of a solemn compact, which remains yet unrepealed in its obligations, securing " proportional representation " and " an apportionment as nearly equal as practicable " by the single district system, under the state constitution requiring such districts to be grouped by counties, with other provisions added by the state constitution for greater security.

The Ordinance of 1787 and the organic act of April 20, 1836, were the fundamental law of the territory, and as a constitution for it, until the admission of the state into the Union, May 20, 1848, under its present constitution, " on an equal footing with the original states," when the Ordinance of 1787 and the organic act as well, which were adapted only to the territorial condition of Wisconsin, became obsolete and ceased to have any operative force, except as voluntarily adopted by her after she became a state of the Union. *Pollard's Lessee v. Hagan*, 3 How. 212; *Permoli v. First Municipality*, 3 How. 589; *Strader v. Graham*, 10 How. 82; *Withers v. Buckley*, 20 How. 92; *Escanaba Co. v. Chicago*, 107 U. S. 678. Though obsolete, these acts may be properly regarded as *in pari materia*, and helpful and of historical value, in construing secs. 3, 4, and 5 of art. IV of the constitution, which came in to take the place of the provisions briefly quoted.

The rules of apportionment and the restrictions upon the power of the legislature are very simple and brief. (1) By sec. 3 the apportionment is required to be " according to the number of inhabitants, excluding," etc. (2) By sec. 4 the members of the assembly shall be chosen annually (*a*) by single districts; . . . (*b*) such districts to be bounded by *county*, precinct, town, or ward lines; (*c*) to consist of

contiguous territory; and (*d*) to be *in as compact form as practicable.* (3) The senators shall be chosen (*a*) by single districts (*b*) of convenient (*c*) contiguous territory; and (*d*) no assembly district shall be divided in the formation of senate districts. Looking at the scope of these limitations, it is obvious that it was intended to secure in the future that which had been adopted and secured and enjoyed almost from the origin of popular representative government in this country to the time the constitution was adopted, "proportionate representation," and apportionment "*as nearly equal as practicable* among the several *counties* for the election of members" of the legislature, as it had existed in Wisconsin since 1836.

The provision of sec. 3 for an apportionment "according to the number of inhabitants" is the exact equivalent of the provisions of the Ordinance of 1787, of a "proportionate representation of the people in the legislature," and it is an incident not without its value that the first apportionment act passed under the constitution at the session of 1851 was vetoed by Governor Dewey on the ground of a very considerable disproportion in the number of inhabitants in senate and assembly districts as constituted by it; that it was unconstitutional, as not being "according to the number of inhabitants;" and the veto was sustained, with only twelve votes in the assembly against it (Assembly Journal, 1851, pp. 810–812); but the disproportion was far less significant than in the act of 1891.

Up to the time of the constitutional convention representation had been by counties, and the single district system had not been much in use elsewhere. The meager report of the debates indicates clearly that, while the members of the convention were willing to adopt the single district system, which Judge DUNN (then chief justice of the supreme court) thought "would open a door for gerrymandering which ought to be kept closed," and were willing to abandon the

former method of electing all the members for an entire
county on a general ticket, yet the discussion proceeded on
the idea that the county was an entire political division, to
be divided into single districts composed entirely of terri-
tory within the county. The leading idea seems to have
been that each county was regarded in the nature of "a
small republic," or "in the light of a family," and "each
organized county had a separate interest," and Mr. Chase
thought it was the province of the supervisors, rather than
of the convention, to divide counties into districts; and Mr.
Prentiss said: "In order to preserve county lines the single
district system must be adopted." The discussion arose on
amending to its present form sec. 4, and which, as origi-
nally introduced, provided for a choice of senators and mem-
bers by single districts, without any direction or restraint
as to the manner of their formation; and the argument is
now urged that the effect and meaning of sections 4 and 5 are
the same only, even after adding the provision in respect
to assembly districts, requiring them to be "bounded by
county, precinct, town, or ward lines, to consist of contigu-
ous territory, and be in as compact form as practicable," as
before, and that no additional restraint was thereby im-
posed on the legislature in the formation of such districts;
and so, too, of the provision added in respect to senate dis-
tricts, requiring them to be "of convenient contiguous terri-
tory;"— in short, that all the provisions of the sections above
referred to are directory merely, and that the entire sub-
ject was left to the legislature, without limitation, to form
such districts in any manner it might see fit. *Journal of
Debates,* 219–224, 382–386.

It does not appear that the language used was employed
by way of exhortation to the legislature to eschew the per-
nicious methods of gerrymandering, then recognized as an
evil to be greatly deplored. It better suits the important
character of the rights sought to be guarded, and the

character and purpose of the instrument, to regard these provisions as mandatory and not directory merely. Mr. Cooley, in his work on Constitutional Limitations, 93–98, discusses the question whether rules which distinguish directory and mandatory statutes apply to the provisions of a constitution, and he arrives at the conclusion that "it will be found, upon full consideration, to be difficult to treat any constitutional provision as merely directory and not imperative." *People ex rel. Crowell v. Lawrence*, 36 Barb. 177, 186; *Cannon v. Mathes*, 8 Heisk. 504, 517; *Varney v. Justice*, 86 Ky. 596; *State v. Johnson*, 26 Ark. 281.

In view of the provisions of the Ordinance of 1787, of the organic act of the territory, and of the history of the provision in question in respect to assembly districts, the intention of the framers of the constitution becomes plain and certain, if it were possible to say that from the language used in it there is any ambiguity or uncertainty so that construction would have any proper office to perform. The provision is, "Such districts to be bounded by county, precinct, town, or ward lines, to consist of contiguous territory, and be in as compact form as practicable;" that is to say, that in creating such districts no county, precinct, town, or ward shall be divided, and there is no more warrant for dividing counties in forming assembly districts than for dividing a precinct, town, or ward. The scope of the language is not that the boundaries of any such districts may be in part by county, and in part by precinct, town, or ward, lines, leaving districts to be formed of parts of different counties, or of one county and part of another, for in such case the use of the words "precinct, town, or ward lines" would have fully answered such purpose or intention, and the use of the word "county" would have been superfluous, because county lines are in all cases identical with town or ward lines, precincts as political divisions having ceased to exist. The word "county" answers a definite and

necessary purpose in expressing in clear, concise language
the object in view, namely, to adopt the single district
system and retain, as before, the county as a subordinate
political division, to be divided into single districts where
its inhabitants are entitled to more than one member, and
prohibiting the division of counties in the formation of as-
sembly districts. This brought the entire constitutional
history on the subject into harmonious relation with the
language used, and avoided the opening of the door to
gerrymandering, as it was feared would be the case if the sin-
gle district system should be adopted, and gives to every part
and word of the provision an appropriate and harmonious
meaning. The rule is that effect is to be given to every
clause or word of a statute, and no word is to be treated as
unmeaning if a construction can be legitimately found
which will preserve it and make it effectual. Sedgw. Stat.
& Const. Law, 200; End. Interp. Stats. § 23. And "this rule
is applicable with special force to written constitutions, in
which the people will be presumed to have expressed them-
selves in careful and measured terms, corresponding with
the immense importance of the powers delegated, leaving
as little as possible to implication." Cooley, Const. Lim. 72.
The rule is that a statute ought, upon the whole, to be so
construed that, if possible, no clause, sentence, or word
shall be superfluous, void, or insignificant. *Harrington v.
Smith,* 28 Wis. 44–67; *Comm. v. Alger,* 7 Cush. 89; *Opinion
of Justices,* 22 Pick. 571; *People v. Burns,* 5 Mich. 114;
*Platt v. U. P. R. Co.* 99 U. S. 48, 58; *Montclair v. Rams-
dell,* 107 U. S. 147, 152.

In the act under consideration there are twenty instances
in which counties have been divided in the formation of as-
sembly districts, in violation of the constitutional rule pre-
serving the territorial integrity of counties in the appor-
tionment of the state into assembly districts; and by no
possible construction of the act can it be brought into har-

mony with the provisions of the constitution. Both the pro-
visions of the constitution and those of the act are too plain
for construction, and the repugnance of the act to the con-
stitution is clear and irreconcilable. The rule in respect to
contemporaneous construction is inapplicable, for no amount
of usage will suffice to dispense with or overcome a plain
statutory provision, much less a plain provision of the con-
stitution. Inasmuch as the several provisions of an act of
apportionment are so largely dependent upon each other,
and as such an act must be regarded as an entirety, and
this one with the objectionable districts would form no
just approximation or relation to an act of apportionment
of the state, there is no alternative but to hold that the act
in question is void, and that the senate and assembly dis-
tricts described in it have no legal existence. The respond-
ent has therefore no lawful authority for giving a notice
of election such as it is alleged he proposes to issue, and the
court cannot but so declare, be the consequences what they
may.

Apprehensions have been entertained as to the effect
which a decision adverse to the validity of the act will have
upon past legislation, and upon the competency of the pres-
ent legislature to pass a valid apportionment, as it is said
that the apportionment act of 1887 is obnoxious to the
same objections as this one. Upon the assumption that the
act of 1887 is void for any reason, senators and members of
assembly who have been elected and have qualified under
it are such *de facto,* and their acts are valid as to the public
and third persons, within repeated decisions of this court.
*In re Boyle,* 9 Wis. 264; *State v. Bloom,* 17 Wis. 521. And
it is no doubt competent for the legislature, at a special
session hereafter called, to pass a valid apportionment act,
notwithstanding the requirement of the constitution that it
be passed at the session *next after* the last enumeration.
The plain intent of this provision is to enable a new appor-

tionment to be made at the earliest practicable period after the enumeration, to the end that the change in the representation thereby required shall readily become effective and not be unreasonably delayed. The duty to pass such an act is a continuing one from the time it is constitutionally devolved upon the legislature until performed, though when thus performed the power to pass any other such act is exhausted and will not again arise until after another enumeration. It has been held in *Rumsey v. People*, 19 N. Y. 41, that under the provisions of the constitution of New York, in substance the same as our own, an apportionment act, passed at a session subsequent to the next one after the enumeration, was valid; and the first apportionment act which became operative in this state was not passed at the next session after the census of 1850, which was held in 1851, and not until the session of 1852, the one passed at the session of 1851 having been vetoed; but no difficulty was experienced by the delay, and it seems plain, both upon principle and precedent, that no objection exists to the passage of a valid act of apportionment at a special session which may be hereafter called. No difficulty, it is believed, need be apprehended as to the result of the decision the court has felt it to be its imperative duty to make; and our respect for the executive of the state, whose duty it is "to take care that the laws are faithfully executed," forbids any apprehension that he will fail in the least in meeting the present emergency, or to take such measures as in his wisdom seem best to give full effect to the constitution and the laws.

A provision of our constitution that "the legislature shall establish but one system of town and county government, which shall be as nearly uniform as practicable" (sec. 23, art. IV; Const.), has been very strictly enforced. *State ex rel. Peck v. Riordan*, 24 Wis. 484, and quite a large number of subsequent cases, show that very many acts have been

declared void because they impaired the uniformity of such system, and the provision has been so construed as to leave little or no discretion to the legislature as to any or what deviation will be constitutional and valid.

The formation of some of the senate districts in this act, particularly the ninth and twenty-eighth, as well as some of the assembly districts, seems to be indicative of a studied and deliberate disregard of the constitutional requirements, rather than of a fair and earnest attempt to conform to or comply with them; and the very great disproportion in the number of inhabitants in certain assembly districts mentioned in the opinion of the chief justice must, it seems to me, be regarded as in violation of the mandate of the constitution to apportion members of the assembly according to inhabitants.

There is, no doubt, a wide distinction between the exercise of a fair, just, and necessary discretion within the rules of constitutional apportionment, and a gross departure and manifest abandonment and defiance of them; between discretion within certain limits and for certain ends, and an open, obvious, and palpable violation of them. It is plain that by disregarding them, namely, that which requires apportionment to be " according to inhabitants " and those which require assembly districts to " be in as compact form as practicable " and that senate districts be formed of " convenient contiguous territory," the right of representation of local constituencies may be grossly violated, and particularly in the formation of senate districts, inasmuch as no assembly district can be divided for that purpose; but whether this court can declare an act of apportionment void in such cases is a question not material to the decision of this case, and which will require further discussion and consideration, and need not be now determined.

The apportionment of the state into senate and assembly districts according to inhabitants is a task, no doubt, of

difficulty and delicacy; and while a liberal margin is necessarily allowable for the exercise of a wise and just discretion, so that the apportionment will be practically just and proportionate,— the end designed to be attained by the constitutional limitations on the power of the legislature,— yet the task is not so intrinsically difficult but that a fair and just result may be readily reached in accord with these limitations, against which no well-grounded complaint can be made.

Winslow, J. I concur in the views expressed by Mr. Justice Pinney.

Lyon, C. J. 1. It is maintained on behalf of the state that the county is the primary territorial unit of representation in the assembly, and that while in some instances, in order to preserve equality of representation, an assembly district must necessarily include two or more counties, yet such district must be bounded exclusively by county lines. Stated in another form, the contention is that in any valid apportionment of the state into assembly districts the integrity of county lines must be preserved, and hence no such district can consist of one, or more than one, county and a fraction of another county, or of fractions of two or more counties. If this is a correct construction of constitutional provisions on the subject, ch. 482, Laws of 1891, cannot be upheld as a valid law, for it violates those provisions in the formation of fifteen or more assembly districts, and dismembers twenty counties. It requires no argument to demonstrate that if such districts are formed in violation of constitutional rules the whole act is void, for the apportionment is an entire process,— each part thereof being affected in a greater or less degree by, and dependent upon, every other part,— and it is impossible to expunge therefrom those portions which dismember counties, and save the residue. The above contention requires the court

to determine the constitutional rules for the formation of valid assembly districts.

Sec. 4, art. IV, of the constitution, provides that assembly districts shall be " bounded by county, precinct, town, or ward lines." The term " precinct," as thus used, has ceased to have any significance. When the constitution was adopted, the optional township system of government, enacted in 1841, did not prevail in several counties of the territory of Wisconsin. Those counties were divided into precincts,— mainly for election purposes,— each of which corresponded in some respects to the town or ward of the other counties. But the precinct of the constitution disappeared when the uniform system of town and county government prescribed by the constitution (art. IV, sec. 23) became fully operative. We have now no civil subdivisions, other than towns and wards, which are the equivalent of the precinct of territorial times. *Chicago & N. W. R. Co. v. Oconto*, 50 Wis. 189. The term may have been used in statutes since the adoption of the constitution, but it will be found, we think, that with a single exception it is so used as the equivalent of " town " or " ward." The exception is found in the legislative apportionment act of 1876 (ch. 343), in which the east and west precincts of the town of Wrightstown in Brown county are named and placed in different assembly districts. If Wrightstown was then an incorporated village, although designated in the act as a town, the term was doubtless employed as the equivalent of " ward." If it was an ordinary town, we are aware of no law authorizing its division, or the division of any town, into precincts which may properly be placed in different assembly districts. Election districts created by municipal authority are not the " precincts " of the constitution. Under existing laws, therefore, we shall feel at liberty to omit the term " precinct " when referring to the above provision of sec. 4, art. IV.

The provision of the constitution that assembly districts shall be bounded by county, town, or ward lines is not only the mandate of the people, acting in their sovereign capacity, to the legislature thus to constitute those districts, but it is a limitation upon the power of the legislature in that behalf, prohibiting that body from constituting such districts in any other manner. The question to be determined is, What is the true meaning and significance of such mandate?

That the provision requires assembly districts to be bounded by town or ward lines, because all county lines are either town or ward lines, and that it prohibits the division of towns and wards in the formation thereof, admits of no doubt. We are to determine what effect is to be given to the specification therein of county as well as town or ward lines. There are two civil or municipal divisions of the state, not named in sec. 4, art. IV, to wit, cities and villages. When the constitution was adopted there existed in the territory villages with town lines passing through and dividing them into two parts. In such cases the dismemberment of villages could not be prevented without dismembering towns. There were also villages divided by county lines, and since that time cities have been organized also divided by county lines. Had the lines of these municipal divisions been specified in the constitution as lines by which assembly districts must be bounded, it would render necessary in several cases the disregarding of county lines and the dismembering of counties in the formation of assembly districts. But the lines of such municipalities are not specified as assembly district boundaries, while the lines of counties, towns, and wards are so specified. The inference is irresistible that such lines are so specified to prevent the dismemberment of counties as well as towns and wards, while the lines of cities and villages are not specified as such boundaries, because it would be necessary

to disregard them and dismember such municipalities in order to prevent the dismemberment of counties and towns.

There is another very cogent reason why the provision under consideration should be held to protect counties, as well as towns and wards, from dismemberment. All county lines are town or ward lines also. If it was only intended thus to protect towns and wards, the word " county " in the provision performs no office whatever, but is meaningless and should be rejected as surplusage. The settled rules of statutory and constitutional construction forbid this, if any force and effect can be given the word. The rule is that every clause and word of a statute — much more of a constitutional provision, which it must be conclusively presumed was framed with the utmost deliberation and care — must be assumed to have been intended to have some force and effect, and, if possible, must be so construed. *Harrington v. Smith*, 28 Wis. 43, and authorities cited by DIXON, C. J., in the opinion. The force and effect the word " county " was intended to have is entirely clear. Inasmuch as the town and ward were thus protected from dismemberment, it was intended by the same provision to protect the county from dismemberment in like manner. It means this, or it has no significance whatever.

The lines of these municipal divisions, counties, towns, and wards, are named in the constitution as boundaries of assembly districts. The county is the larger and more important division, and accordingly is first named. Under familiar and elementary rules of construction it should first be regarded in making the apportionment, and the assembly districts should be bounded by county lines until the necessity arises for bounding them by town or ward lines which are not county lines also. This necessity only arises because the constitution provides for choosing members of assembly by single districts, and some counties have a sufficient number of inhabitants to entitle each of them to

more than one member of assembly. Such counties must necessarily be divided into the requisite number of assembly districts. The external boundaries of such districts, or some of them, will still be county lines, but the interior boundaries thereof will necessarily be town or ward, and not county, lines. But for the necessity of dividing some counties into two or more assembly districts, there would have been no necessity of mentioning town and ward lines in sec. 4 of art. IV, for all the assembly district boundaries would in such case have been county lines. In such case, doubtless, county lines only would have been specified, as in the provision for the formation of judicial circuits. Const. art. VII, sec. 6.

The construction which we have thus given the constitutional provision under consideration, were its meaning at all doubtful, is supported by certain conditions and circumstances existing when the constitution was adopted. Before that time it had never happened in Wisconsin that a county was dismembered in the formation of a legislative district. If a county was entitled to more than one representative in either branch of the legislature, both or all of them were elected on a general ticket. If the same district extended into two or more counties, both or all of such counties were invariably included therein entire. See Leg. Man. 1891, pp. 116–125. Neither had there been elsewhere (so far as we know or are advised by the argument) any dismemberment of a county in the formation of a legislative district. Furthermore, for nearly a quarter of a century after the adoption of the constitution (with a single possible exception), no attempt was made to dismember a county in an apportionment of members of the assembly, although during that time four such apportionments were made. Laws of 1852, ch. 497; 1856, ch. 109; 1861, ch. 216; 1866, ch. 101. The possible exception referred to is that in the first of these acts an assembly district was constituted

of certain towns in Marquette county and the county of Waushara.   The latter county was created by ch. 77, Laws of 1851.   Its territory was taken entirely from Marquette county, and it remained attached to that county for judicial purposes until it was fully organized under ch. 34, Laws of 1852.   If the apportionment of 1852 speaks from the time the enumeration of inhabitants was made upon which it was based (which was in 1850), or from any time before the enactment of ch. 77 aforesaid during the legislative session of 1851,— that being the session at which the apportionment should have been made,— there was no dismemberment of Marquette county in that apportionment. Otherwise there was such dismemberment.   But, if that was a violation of the constitutional rule, it was doubtless inadvertently done, and the integrity of county lines was restored in the next apportionment, and was not again violated until 1871.

It has been suggested, however, that the first legislative apportionment, which is contained in the constitution and is a part of it, dismembered the county of Iowa.   The provision referred to is this:  " The precincts of Franklin, Dodgeville, Porter's Grove, Arena, and Percussion in the county of Iowa, and the county of Richland, shall constitute an assembly district."   [Art. XIV, sec. 12.]   On its face this looks like the dismemberment of Iowa county.   If it were such, it would prove nothing more than that the people who adopted the constitution, acting in their sovereign capacity, did an act which they prohibited future legislatures from doing.   But, for reasons which will now be stated, Iowa county was not dismembered by the constitutional apportionment.

By an act of the territorial legislature entitled " An act to establish the county of Richland," approved February 18, 1842, the territory now included in that county was " constituted a separate county by the name of Richland,"

and by the same act was "attached temporarily to the county of Iowa for all county and judicial purposes." This legislation merely designated, by boundary of the tract, certain contiguous townships and sections in Iowa county as Richland county. It was a mere geographical designation, carrying with it no municipal, judicial, or other function (if there be any other) of county government. The inhabitants of the prescribed territory remained inhabitants of Iowa county, with all the rights, privileges, and immunities pertaining thereto. The qualified electors therein were qualified electors of Iowa county, eligible to hold the public offices therein, and, if citizens, competent to sit as jurors in the courts thereof. The act of 1842 had no more effect on the civil or political *status* of those people than as though the legislature had bestowed upon the designated territory any other mere geographical name, without using the term "county" at all. This condition of things remained unchanged until 1850, when the legislature provided for the organization of Richland county, and the same was thereafter organized pursuant to the statute in that behalf. Laws of 1850, ch. 92.

There are most satisfactory reasons why the unity of counties was thus universally respected and preserved. The county is the chief civil subdivision of the state. It, or its equivalent, has existed from the first in all the states and territories of the Union. It has always been the medium through which the state performs some of its most important functions, particularly that of raising revenue. Its governing body has always been clothed with important legislative powers of a local character, directly affecting the welfare of all the people within its borders. It is a sort of *imperium in imperio* as regards local self-government in many particulars. These functions were regarded so important that the constitution expressly gives the legislature power to "confer upon the boards of supervisors

of the several counties of the state such powers of a local legislative and administrative character as they shall from time to time prescribe." Sec. 22, art. IV.   This is one of the most ample grants of power in the constitution, and its insertion therein proves the importance of the county and county government in the estimation of the people who adopted the constitution.

The people of a county have common interests and objects, peculiar to themselves, and intimate public relations with each other.   The electors thereof vote for the same public officers; are subject to the jurisdiction of and attend the same courts; some of them sit upon the same juries and in the same board of supervisors; and all have a common interest in all county affairs.   Hence, when the constitution was adopted, it was deemed of vital importance that dismemberment of counties in the formation of assembly districts should be avoided, to the end that each county having sufficient population should have its own representative in the legislature, chosen by its own electors and them only, and owing no divided, perhaps conflicting, allegiance to any other constituency.   True, because of the sparse population in some portions of the state, it was and is necessary in some cases to include more than a single county in one assembly district.   But the autonomy of the county could still be preserved, and the evils of county dismemberment in a great measure avoided, by making such districts consist of whole counties.   This may easily be done in the apportionment of the state into assembly districts, without infringing any constitutional requirement.

The single legislative district system was incorporated into the constitution.   This rendered necessary a division of those counties the population of each of which entitled it to more than one member of the assembly.   But under that system there is no difficulty in avoiding the dismemberment of counties, by confining exterior lines of such dis-

tricts to county lines, where they extend to county lines. By so doing, the county will be saved from dismemberment and preserved as the primary territorial unit of the assembly districts.

To the above-mentioned conditions it may be added that the debates in the convention which framed the constitution, and the earnest protests of leading members of that body, and of many other citizens contemporary with them, against such dismemberment when proposed in later years (all which is matter of history), furnish additional evidence that the convention which framed and the people who adopted the constitution intended thereby to preserve the integrity of counties in the formation of assembly districts.

Considering all the facts and circumstances above stated, and having due regard to the language of the constitution in that behalf, we are impelled to the conclusion that it was not intended thereby to permit the legislature to dismember any county in the formation of assembly districts;— that is to say, it prohibits the legislature from placing one county, or more than one, and a portion of another county, or portions of two or more counties, in the same assembly district; — and that such prohibition is found in the provision which requires that assembly districts shall be bounded by county, town, or ward lines. If a county has a sufficient number of inhabitants to entitle it to two or more assemblymen, the requisite number of districts must be formed entirely within the limits of such county. But this is no more dismemberment than is the division of a county into towns.

The departure from the requirements of the constitution in the formation of assembly districts practically commenced with the apportionment of 1871, in which a fraction of Kewaunee county was placed in an assembly district with a fraction of Brown county, and the residue of Kewaunee county in a district with Door county. The

city of Watertown, being in Dodge and Jefferson counties, was made a district, and another district was created which included fractions of Waupaca and Outagamie counties. Ch. 156, Laws of 1871.

In the next apportionment (ch. 343, Laws of 1876) we find but two such cases. The city of Watertown entire and certain towns in Jefferson county were placed in one assembly district, and Pepin county, with a fraction of Buffalo county, constituted another district.

The apportionment of 1882 furnishes but one case of county dismemberment. Fractions of Calumet and Outagamie counties were placed in one assembly district. Ch. 242, Laws of 1882.

In the apportionment of 1887 we find an assembly district composed of fractions of Green and La Fayette counties; another of fractions of Winnebago and Outagamie counties; another of fractions of Manitowoc and Kewaunee counties; and another of fractions of Shawano and Waupaca counties. Ch. 461, Laws of 1887. By this time the constitutional rule had been pretty effectually undermined, and so, when the apportionment of 1891 was made, but little attention seems to have been given to it. The number of infractions of the rule therein is quite largely increased over those in former apportionments.

As already stated, it is quite impossible to uphold the apportionment of 1891 in part, and declare it invalid as to the residue. It must be held, therefore, that the violations of the constitutional rule prohibiting the dismemberment of counties vitiate the whole act.

2. Ch. 482, Laws of 1891, violates another constitutional requirement. Sec. 3, art. IV, ordains that apportionments of legislative districts shall be made according to population, excluding therefrom certain classes of persons therein specified. Because the county is the primary territorial unit in the formation of assembly districts, and members

of assembly must first be apportioned to counties, the above provision of sec. 3, as applied to the formation of assembly districts, must be construed to mean that there must be substantial equality of representation, in proportion to population, as between all the different counties and districts composed of two or more counties; that is to say, there must be no unnecessary inequality in the proportionate representation in the assembly of counties and of such districts, on the basis of population.

Each county, and each district consisting of two or more counties, having a population equal to the numerical unit of representation in the assembly (alleged to be 16,868), is entitled absolutely to one member of assembly, unless it should be found necessary to place a county not thus entitled to a member in a district with a county which otherwise would of itself be entitled to one member. It is believed, however, that no necessity exists for forming such a district in the apportionment based on the enumeration of 1890. For each multiple of such numerical unit reached by the population of any county, such county is also absolutely entitled to an additional member of assembly. The remainder of the 100 members, not thus absolutely apportioned to counties and districts, should be apportioned to an equal number of the several counties by some uniform equitable rule,— perhaps to the counties having the largest fractions of population in excess of such numerical unit of representation or multiple thereof. The legislature must, however, determine such rule; but the writer will be pardoned for saying, for himself alone, that he is aware of no mathematical formula which will accomplish the required result, other than that above suggested, which prefers in the apportionment the largest fractions of population.

Ch. 482 violates the foregoing rule. For example, it gives La Crosse county, with 38,801 inhabitants, but one member of assembly; while it gives Manitowoc county,

with 37,831 inhabitants, three members. It may be urged that any inequality of representation in the different assembly districts is in a measure removed or compensated for in the formation of senate districts, as, for example, La Crosse county, which is deprived of one assemblyman to which it is absolutely entitled, is made a senate district, although it lacks about 13,000 inhabitants of the numerical unit of representation for a senate district. On any proper rule of apportionment this cannot be done, for the very conclusive reason that the constitution gives each county an absolute right to its proportionate representation in the assembly, without regard to its representation in the senate. Moreover, the assembly district is the territorial unit of the senate district, and the latter cannot be intelligently formed until the limits of the assembly districts are established. It is unnecessary to enlarge upon this branch of the case. It is not difficult to apportion the members of assembly to the several counties, and to form the several districts which must contain two or more counties, in strict compliance with constitutional provisions.

3. After the number of members of assembly to which each county is entitled shall have been ascertained by the rules above stated, the next step in the process of apportionment will be to divide each county entitled to more than one member into the requisite number of assembly districts, each of which must consist of contiguous territory. In making such division the rules of compactness and numerical equality of population, so far as practicable, are also imposed upon the legislature by the constitution. These latter requirements are largely modified by other constitutional rules, especially the rule which prohibits the dismemberment of towns and wards. The mode of compliance therewith must necessarily rest largely in the discretion of the legislature. Nothing short of palpable disregard of duty in these particulars, which it is scarcely

The State ex rel. Attorney General vs. Cunningham.

possible to impute to any legislature, would justify the courts in holding a legislative apportionment invalid.

4. When the assembly districts shall have been properly apportioned and formed, and not until then, is there a proper basis for the formation of the senate districts. Each of these must consist of entire assembly districts, and must be formed of convenient contiguous territory. They must also be as nearly equal in population as other constitutional requirements will permit.

5. The complaint charges that the senate districts are so numbered in ch. 482 that large numbers of electors who were last permitted to vote for senators in 1888 cannot do so again until 1894, while other large numbers of electors who voted for senators in 1890 may again do so in 1892. This is alleged as a reason why the act is invalid. The court finds in the constitution no authority conferred upon it to interfere with the numbering of the senate districts. In that respect the power of the legislature is absolute.

6. The decision herein does not impeach the validity of acts, otherwise valid, of a legislature elected under an invalid legislative apportionment statute. Neither is the jurisdiction of the court affected, or the exercise thereof embarrassed, by the fact that this decision may leave the state without a valid legislative apportionment law, and hence without any law for the election of another legislature. The governor may convene the present legislature, if he deems it his duty to do so, and when so convened there can be no doubt of its power to enact a valid legislative apportionment law.

7. The question of jurisdiction has been fully discussed by Justices ORTON and PINNEY, and nothing need here be said on the subject, unless it be to express the conviction of the writer that there can be no reasonable doubt of the jurisdiction of the court to direct and control the action of the secretary of state in the premises.

CASSODAY, J.   The decision in this important case is fully in accord with my judgment.   The reasons in support of it, given in the several opinions filed, taken together, are so full and complete as to call for nothing additional from me.

*By the Court.*— The motion in the nature of a demurrer is overruled, and the defendant has leave to answer within twenty days.

See note to this case in 15 L. R. A. 561.— REP